# ANDERSON ET AL. v. CELEBREZZE, SECRETARY OF STATE OF OHIO

No. 81–1635. Argued December 6, 1982—Decided April 19, 1983

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, and BLACKMUN, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which WHITE, POWELL, and O'CONNOR, JJ., joined, *post*, p. 806.

*George T. Frampton, Jr.*, argued the cause for petitioners. With him on the briefs were *Mitchell Rogovin, James E. Pohlman,* and *Thomas A. Young.*

*Joel S. Taylor* argued the cause for respondent. With him on the brief was *William J. Brown,* Attorney General of Ohio.*

JUSTICE STEVENS delivered the opinion of the Court.

On April 24, 1980, petitioner John Anderson announced that he was an independent candidate for the office of President of the United States. Thereafter, his supporters—by gathering the signatures of registered voters, filing required documents, and submitting filing fees—were able to meet the substantive requirements for having his name placed on the ballot for the general election in November 1980 in all 50 States and the District of Columbia. On April 24, however, it was already too late for Anderson to qualify for a position on the ballot in Ohio and certain other States because the statutory deadlines for filing a statement of candidacy had already passed. The question presented by this case is whether Ohio's early filing deadline placed an unconstitutional burden on the voting and associational rights of Anderson's supporters.

The facts are not in dispute. On May 16, 1980, Anderson's supporters tendered a nominating petition containing approximately 14,500 signatures and a statement of candidacy to respondent Celebrezze, the Ohio Secretary of State. These documents would have entitled Anderson to a place on the ballot if they had been filed on or before March 20, 1980. Respondent refused to accept the petition solely because it had not been filed within the time required by § 3513.25.7 of

---

*Arthur N. Eisenberg, Charles S. Sims, Bruce Campbell,* and *John C. Armor* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

*Paul S. Allen* filed a brief for the Libertarian National Committee as *amicus curiae.*

the Ohio Revised Code.[1] Three days later Anderson and three voters, two registered in Ohio and one in New Jersey, commenced this action in the United States District Court for the Southern District of Ohio, challenging the constitutionality of Ohio's early filing deadline for independent candidates. The District Court granted petitioners' motion for summary judgment and ordered respondent to place Anderson's name on the general election ballot. 499 F. Supp. 121 (1980).

The District Court held that the statutory deadline was unconstitutional on two grounds. It imposed an impermissible burden on the First Amendment rights of Anderson and his Ohio supporters and diluted the potential value of votes that might be cast for him in other States. Moreover, by requiring an independent to declare his candidacy in March without mandating comparable action by the nominee of a political party, the State violated the Equal Protection Clause of the Fourteenth Amendment. The District Court noted that the State did not advance any administrative reasons for the early deadline and rejected the State's asserted justification that the deadline promoted "political stability." Not only did that interest have diminished importance in a Presidential

---

[1] Section 3513.25.7 provides, in pertinent part:

"Each person desiring to become an independent candidate for an office for which candidates may be nominated at a primary election, except persons desiring to become independent joint candidates for the offices of governor and lieutenant governor, shall file no later than four p.m. of the seventy-fifth day before the day of the primary election immediately preceding the general election at which such candidacy is to be voted for by the voters, a statement of candidacy and nominating petition as provided in section 3513.261 [3513.26.1] of the Revised Code. . . ." Ohio Rev. Code Ann. § 3513.25.7 (Supp. 1982).

The Code sets the first Tuesday after the first Monday in June as the date of the primary election, § 3501.01(E), a date that fell on June 3, 1980. Thus the filing deadline for independent candidates was March 20, 1980, a date 229 days in advance of the general election. Section 3513.25.7(A) requires independent candidates in statewide elections, including Presidential primaries, to submit nominating petitions signed by no less than 5,000 and no more than 15,000 qualified voters.

campaign; it also was adequately vindicated by another statute prohibiting a defeated candidate in a party primary from running as an independent.[2]

The Secretary of State promptly appealed and unsuccessfully requested expedited review in both the Court of Appeals and this Court, but apparently did not seek to stay the District Court's order.[3] The election was held while the appeal was pending. In Ohio Anderson received 254,472 votes, or 5.9 percent of the votes cast; nationally, he received 5,720,060 votes or approximately 6.6 percent of the total.[4]

The Court of Appeals reversed. It first inferred that the Court's summary affirmances in *Sweetenham* v. *Rhodes*, 318 F. Supp. 1262 (SD Ohio 1970), summarily aff'd, 409 U. S. 942 (1972), and *Pratt* v. *Begley*, 352 F. Supp. 328 (ED Ky. 1970), summarily aff'd, 409 U. S. 943 (1972), had implicitly sustained the validity of early filing deadlines. Then, correctly recognizing the limited precedential effect to be accorded summary dispositions,[5] the Court of Appeals independently

---

[2] Anderson's name had been entered in the Republican primary in Ohio and 26 other States before he made his decision to run as an independent, and he actually competed unsuccessfully in nine Republican primaries. Nevertheless, the parties agree that his timely withdrawal from the Ohio primary avoided the application of the State's "sore loser" statute, Ohio Rev. Code Ann. § 3513.04 (Supp. 1982), which disqualifies a candidate who ran unsuccessfully in a party primary from running as an independent in the general election. See 499 F. Supp. 121, 135, 140 (SD Ohio 1980); 664 F. 2d 554, 556, n. 3 (CA6 1981).

[3] After the Court of Appeals denied a motion for expedited appeal, respondent filed a petition for a writ of certiorari before judgment in this Court, together with a motion to expedite consideration of the petition. The motion and the petition were both denied before the election in November 1980. 448 U. S. 914 and 918 (1980). Even though the 1980 election is over, the case is not moot. See *Storer* v. *Brown*, 415 U. S. 724, 737, n. 8 (1974).

[4] 14 America Votes, A Handbook of Contemporary American Election Statistics 18–19, 312, 317 (1981).

[5] The Court of Appeals quite properly concluded that our summary affirmances in *Sweetenham* v. *Gilligan* and *Pratt* v. *Begley* were "a rather slender reed" on which to rest its decision. 664 F. 2d, at 560. We have often

reached the same conclusion. It held that Ohio's early deadline "ensures that voters making the important choice of their next president have the opportunity for a careful look at the candidates, a chance to see how they withstand the close

recognized that the precedential effect of a summary affirmance extends no further than "the precise issues presented and necessarily decided by those actions." A summary disposition affirms only the judgment of the court below, and no more may be read into our action than was essential to sustain that judgment. *Illinois Elections Bd.* v. *Socialist Workers Party,* 440 U. S. 173, 182–183 (1979); *Mandel* v. *Bradley,* 432 U. S. 173, 176 (1977); see *Fusari* v. *Steinberg,* 419 U. S. 379, 391–392 (1975) (BURGER, C. J., concurring). Neither *Sweetenham* nor *Pratt* involved state-imposed filing deadlines for Presidential candidates. See Juris. Statement in *Pratt* v. *Begley,* O. T. 1972, No. 70–48, p. 4 (independent candidates for U. S. House of Representatives); Juris. Statement in *Sweetenham* v. *Rhodes,* O. T. 1972, No. 70–15, p. 5 (independent candidates for Governor of Ohio and U. S. House of Representatives). Further, *Sweetenham* arose on review of the District Court's refusal to grant injunctive relief placing appellants on the ballot. The court relied at least in part on appellants' failure to take steps to become candidates before the primary, a date 90 days after the challenged filing deadline, or indeed to tender nominating petitions at any time before filing suit. See *id.,* at 30. In *Pratt,* the District Court dismissed a complaint seeking declaratory as well as injunctive relief, concluding that the early filing deadline was reasonable, but it could have refused to place appellants on the ballot on the equitable ground that they had not submitted nominating petitions until more than two and a half months after the party nominees were chosen in the primary. 352 F. Supp., at 329.

As the Court of Appeals acknowledged, our remand in *Mandel* v. *Bradley, supra,* does not control this case. Plaintiff, who had sought to run as an independent candidate for United States Senator from Maryland, challenged a Maryland code provision imposing both an early filing deadline and a numerical signature requirement. Neither of the parties addressed the constitutionality of the filing date standing alone. The District Court improperly relied on a prior summary affirmance by this Court to strike down the restriction, and failed to undertake an independent examination of the merits. We remanded for factual findings. *Id.,* at 177–178. On remand, the District Court found that the early filing deadline imposed unconstitutional burdens on the plaintiff. *Bradley* v. *Mandel,* 449 F. Supp. 983, 986–989 (Md. 1978).

scrutiny of a political campaign." 664 F. 2d 554, 563 (CA6 1981).

In other litigation brought by Anderson challenging early filing deadlines in Maine and Maryland, the Courts of Appeals for the First and Fourth Circuits affirmed District Court judgments ordering Anderson's name placed on the ballot. See *Anderson* v. *Quinn*, 495 F. Supp. 730 (Me.), affirmance order, 634 F. 2d 616 (CA1 1980); *Anderson* v. *Morris*, 500 F. Supp. 1095 (Md.), aff'd, 636 F. 2d 55 (CA4 1980).[6] The conflict among the Circuits on an important question of constitutional law led us to grant certiorari. 456 U. S. 960 (1982). We now reverse.

## I

After a date toward the end of March, even if intervening events create unanticipated political opportunities, no independent candidate may enter the Presidential race and seek to place his name on the Ohio general election ballot. Thus the direct impact of Ohio's early filing deadline falls upon aspirants for office. Nevertheless, as we have recognized, "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." *Bullock* v. *Carter*, 405 U. S. 134, 143 (1972). Our primary concern is with the tendency of ballot access restrictions "to limit the field of candidates from which voters might choose." Therefore, "[i]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters." *Ibid.*

The impact of candidate eligibility requirements on voters implicates basic constitutional rights.[7] Writing for a unani-

---

[6] Anderson also prevailed on First Amendment and Equal Protection Clause grounds in *Anderson* v. *Hooper*, 498 F. Supp. 898, 905 (NM 1980), and on state-law grounds in *Greaves* v. *Mills*, 497 F. Supp. 283 (ED Ky. 1980), rev'd in part on other grounds, 664 F. 2d 600 (CA6 1981).

[7] In this case, we base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection

mous Court in *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 460 (1958), Justice Harlan stated that it "is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." In our first review of Ohio's electoral scheme, *Williams* v. *Rhodes,* 393 U. S. 23, 30–31 (1968), this Court explained the interwoven strands of "liberty" affected by ballot access restrictions:

> "In the present situation the state laws place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms."

As we have repeatedly recognized, voters can assert their preferences only through candidates or parties or both. "It is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues." *Lubin* v. *Panish,* 415 U. S. 709, 716 (1974). The right to vote is "heavily burdened" if that vote may be cast only for major-party candidates at a time when other parties or other candidates are "clamoring for a place on the ballot." *Ibid.; Williams* v. *Rhodes, supra,* at 31. The exclusion of candidates also burdens voters' free-

Clause analysis. We rely, however, on the analysis in a number of our prior election cases resting on the Equal Protection Clause of the Fourteenth Amendment. These cases, applying the "fundamental rights" strand of equal protection analysis, have identified the First and Fourteenth Amendment rights implicated by restrictions on the eligibility of voters and candidates, and have considered the degree to which the State's restrictions further legitimate state interests. See, *e. g., Williams* v. *Rhodes,* 393 U. S. 23 (1968); *Bullock* v. *Carter,* 405 U. S. 134 (1972); *Lubin* v. *Panish,* 415 U. S. 709 (1974); *Illinois Elections Bd.* v. *Socialist Workers Party, supra.*

dom of association, because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying point for like-minded citizens.[8]

Although these rights of voters are fundamental, not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally suspect burdens on voters' rights to associate or to choose among candidates. We have recognized that, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer* v. *Brown,* 415 U. S. 724, 730 (1974). To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes. Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends. Nevertheless, the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.[9]

---

[8] See *Williams* v. *Rhodes,* 393 U. S., at 31 ("The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes"); *id.,* at 41 (Harlan, J., concurring in result) ("[B]y denying the appellants any opportunity to participate in the procedure by which the President is selected, the State has eliminated the basic incentive that all political parties have for conducting such activities, thereby depriving appellants of much of the substance, if not the form, of their protected rights"); *Illinois Elections Bd.* v. *Socialist Workers Party,* 440 U. S., at 186 ("[A]n election campaign is a means of disseminating ideas as well as attaining political office. . . . Overbroad restrictions on ballot access jeopardize this form of political expression").

[9] We have upheld generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself. The State has the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with the

Constitutional challenges to specific provisions of a State's election laws therefore cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions. *Storer, supra,* at 730. Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. See *Williams* v. *Rhodes, supra,* at 30–31; *Bullock* v. *Carter,* 405 U. S., at 142–143; *American Party of Texas* v. *White,* 415 U. S. 767, 780–781 (1974); *Illinois Elections Bd.* v. *Socialist Workers Party,* 440 U. S. 173, 183 (1979). The results of this evaluation will not be automatic; as we have recognized, there is "no substi-

---

names of frivolous candidates. *Jenness* v. *Fortson,* 403 U. S. 431 (1971); *American Party of Texas* v. *White,* 415 U. S. 767 (1974); cf. *Storer* v. *Brown,* 415 U. S., at 738–746; *Mandel* v. *Bradley,* 432 U. S. 173 (1977) (remand to assess burden placed by State's signature-gathering requirements on independent candidates). The State also has the right to prevent distortion of the electoral process by the device of "party raiding," the organized switching of blocs of voters from one party to another in order to manipulate the outcome of the other party's primary election. *Rosario* v. *Rockefeller,* 410 U. S. 752 (1973); cf. *Kusper* v. *Pontikes,* 414 U. S. 51, 59–61 (1973).

We have also upheld restrictions on candidate eligibility that serve legitimate state goals which are unrelated to First Amendment values. See *Clements* v. *Fashing,* 457 U. S. 957 (1982) (incumbent Justice of the Peace may not seek election to state legislature; persons holding specified state and county offices are deemed automatically to resign from present office if they run for another elective office).

tute for the hard judgments that must be made." *Storer* v. *Brown, supra,* at 730.[10]

## II

An early filing deadline may have a substantial impact on independent-minded voters. In election campaigns, particularly those which are national in scope, the candidates and the issues simply do not remain static over time. Various candidates rise and fall in popularity; domestic and international developments bring new issues to center stage and may affect voters' assessments of national problems. Such developments will certainly affect the strategies of candidates who have already entered the race; they may also create opportunities for new candidacies. See A. Bickel, Reform and Continuity 87–89 (1971). Yet Ohio's filing deadline prevents persons who wish to be independent candidates from entering the significant political arena established in the State by a Presidential election campaign—and creating new political coalitions of Ohio voters—at any time after mid to late March.[11] At this point developments in campaigns for

---

[10] See *American Party of Texas* v. *White, supra,* at 780–781; *Illinois Elections Bd.* v. *Socialist Workers Party, supra,* at 188–189 (BLACKMUN, J., concurring); cf. *Mississippi University for Women* v. *Hogan,* 458 U. S. 718, 724 (1982).

[11] As Professor Bickel has written:

"Never has it been as evident as in 1968 that unforeseen occurrences in the early portion of an election year can fundamentally affect all political expectations. For administrative reasons, there has to be a cutoff date sometime, but there is more than a little of the capricious in laws that force a commitment to act (within or without the major parties) in at least two states before such an upheaval as President Johnson's withdrawal on March 31, 1968, and in many states before important primaries, not to mention such an event as the assassination of Robert F. Kennedy on June 5, 1968." A. Bickel, Reform and Continuity 88 (1971).

Indeed, because it takes time for an independent Presidential candidate and his supporters to gather the requisite 5,000 signatures on nominating petitions, the independent must decide to run well in advance of the March filing deadline. In contrast, Ohio law provides for the automatic inclusion of the Presidential nominees of the major parties on the general election

the major-party nominations have only begun, and the major parties will not adopt their nominees and platforms for another five months. Candidates and supporters within the major parties thus have the political advantage of continued flexibility; for independents, the inflexibility imposed by the March filing deadline is a correlative disadvantage because of the competitive nature of the electoral process.

If the State's filing deadline were later in the year, a newly emergent independent candidate could serve as the focal point for a grouping of Ohio voters who decide, after mid-March, that they are dissatisfied with the choices within the two major parties. As we recognized in *Williams* v. *Rhodes*, 393 U. S., at 33, "[s]ince the principal policies of the major parties change to some extent from year to year, and since the identity of the likely major party nominees may not be known until shortly before the election, this disaffected 'group' will rarely if ever be a cohesive or identifiable group until a few months before the election." [12] Indeed, several

---

ballot, Ohio Rev. Code Ann. § 3505.10 (Supp. 1982), even if they have never filed a statement of candidacy in Ohio. Their identities are not established until after the major-party conventions in August.

[12] Five individuals were able to qualify as independent Presidential candidates in Ohio in 1980. 499 F. Supp., at 143–144. But their inclusion on the ballot does not negate the burden imposed on the associational rights of independent-minded voters. These candidates—Gus Hall of the Communist Party, Richard Congress of the Socialist Workers Party, Deirdre Griswold of the Workers World Party, Ed Clark of the Libertarian Party, and Barry Commoner of the Citizen's Party—represented ideologically committed minor parties which did not proceed through the "minor party" provisions of the Ohio Election Code. Their candidacies corresponded to the protected First Amendment interests of some Ohio voters. But, unlike Anderson's, they were unlikely adequately to satisfy the voting and associational interests of voters whose independent political leanings crystallized as a result of developments in the course of the primary campaigns. Cf. Developments in the Law—Elections, 88 Harv. L. Rev. 1111, 1143, n. 130 (1975) ("From the standpoint of potential supporters, minor parties and independent candidates differ in that the latter are free from ties and obligations to party organizations, and support for them is not so total a

important third-party candidacies in American history were launched after the two major parties staked out their positions and selected their nominees at national conventions during the summer.[13] But under § 3513.25.7, a late-emerging Presidential candidate outside the major parties, whose positions on the issues could command widespread community support, is excluded from the Ohio general election ballot. The "Ohio system thus denies the 'disaffected' not only a choice of leadership but a choice on the issues as well." *Williams* v. *Rhodes, supra,* at 33.

Not only does the challenged Ohio statute totally exclude any candidate who makes the decision to run for President as an independent after the March deadline, it also burdens the signature-gathering efforts of independents who decide to run in time to meet the deadline. When the primary campaigns are far in the future and the election itself is even more remote, the obstacles facing an independent candidate's organizing efforts are compounded. Volunteers are more difficult to recruit and retain, media publicity and campaign contributions are more difficult to secure, and voters are less interested in the campaign.[14]

It is clear, then, that the March filing deadline places a particular burden on an identifiable segment of Ohio's independent-minded voters. See *supra,* at 791. As our cases have held,

---

commitment of political allegiance because it does not require renunciation of major party affiliation").

Our focus on the associational rights of independent-minded voters distinguishes the burden imposed by Ohio's early filing deadline from that created by the California disaffiliation provision upheld in *Storer* v. *Brown,* 415 U. S. 724 (1974). Although a disaffiliation provision may preclude such voters from supporting a particular ineligible candidate, they remain free to support and promote other candidates who satisfy the State's disaffiliation requirements.

[13] See generally App. to Brief for American Civil Liberties Union as *Amicus Curiae* 10a–12a; Bickel, *supra* n. 11, at 87.

[14] See *Bradley* v. *Mandel,* 449 F. Supp., at 986–987 (findings of fact of three-judge District Court on remand from this Court).

it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status.[15] "Our ballot access cases . . . focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the 'availability of political opportunity.'" *Clements* v. *Fashing*, 457 U. S. 957, 964 (1982) (plurality opinion), quoting *Lubin* v. *Panish*, 415 U. S., at 716.[16]

A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amend-

---

[15] In *Bullock* v. *Carter*, 405 U. S., at 144, the Court noted that the disparity in voting power created by high candidate filing fees "cannot be described by reference to discrete and precisely defined segments of the community as is typical of inequities challenged under the Equal Protection Clause." Indeed, the impact fell on an undetermined number of voters. *Id.*, at 149. Yet the filing fees were unconstitutional because of the "obvious likelihood that this limitation would fall more heavily on the less affluent segment of the community, whose favorites may be unable to pay the large costs required by the Texas system." *Id.*, at 144.

See also L. Tribe, American Constitutional Law 774–775 (1978). As Professor Tribe explains, although candidate eligibility requirements may exclude particular candidates, it remains possible that an eligible candidate will "adequately reflect the perspective of those who might have voted for a candidate who has been excluded." *Id.*, at 774, n. 2. But courts quite properly "have more carefully appraised the fairness and openness of laws that determine which political groups can place *any* candidate of their choice on the ballot." *Id.*, at 774. Cf. Developments in the Law—Elections, *supra* n. 12, at 1218, and n. 5.

[16] In addition, because the interests of minor parties and independent candidates are not well represented in state legislatures, the risk that the First Amendment rights of those groups will be ignored in legislative decisionmaking may warrant more careful judicial scrutiny. *Id.*, at 1136, n. 87; see generally *United States* v. *Carolene Products Co.*, 304 U. S. 144, 152, n. 4 (1938); J. Ely, Democracy and Distrust: A Theory of Judicial Review 73–88 (1980).

ment. It discriminates against those candidates and—of particular importance—against those voters whose political preferences lie outside the existing political parties. *Clements* v. *Fashing, supra,* at 964–965 (plurality opinion). By limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, such restrictions threaten to reduce diversity and competition in the marketplace of ideas. Historically political figures outside the two major parties have been fertile sources of new ideas and new programs; many of their challenges to the status quo have in time made their way into the political mainstream. *Illinois Elections Bd.* v. *Socialist Workers Party,* 440 U. S., at 186; *Sweezy* v. *New Hampshire,* 354 U. S. 234, 250–251 (1957) (opinion of Warren, C. J.).[17] In short, the primary values protected by the First Amendment—"a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270 (1964)—are served when election campaigns are not monopolized by the existing political parties.

Furthermore, in the context of a Presidential election, state-imposed restrictions[18] implicate a uniquely important

---

[17] See generally V. Key, Politics, Parties, and Pressure Groups 278–303 (3d ed. 1952). As Professor Bickel has observed,

"Again and again, minor parties have led from a flank, while the major parties still followed opinion down the middle. In time, the middle has moved, and one of the major parties or both occupy the ground reconnoitered by the minor party; . . . .

"[A]s an outlet for frustration, often as a creative force and a sort of conscience, as an ideological governor to keep major parties from speeding off into an abyss of mindlessness, and even just as a technique for strengthening a group's bargaining position for the future, the minor party would have to be invented if it did not come into existence regularly enough." Bickel, *supra* n. 11, at 79–80.

[18] The Constitution expressly delegates authority to the States to regulate the selection of Presidential electors. U. S. Const., Art. II, § 1; see *McPherson* v. *Blacker,* 146 U. S. 1, 35 (1892). But, as we have emphasized, "we must reject the notion that Art. II, § 1, gives the States power

national interest. For the President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation. Moreover, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States.[19] Thus in a Presidential election a State's enforcement of more stringent ballot access requirements, including filing deadlines, has an impact beyond its own borders.[20] Similarly, the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries. This Court, striking down a state statute unduly restricting the choices made by a major party's Presidential nominating convention, observed that such conventions serve "the pervasive national interest in the selection of candidates for national office, and this national interest is greater than any interest of an individual State." *Cousins* v. *Wigoda*, 419 U. S. 477, 490 (1975). The Ohio filing deadline challenged in this case does more than burden the associational rights of independent voters and candidates. It places a significant state-imposed restriction on a nationwide electoral process.

to impose burdens on the right to vote, where such burdens are expressly prohibited in other constitutional provisions." *Williams* v. *Rhodes*, 393 U. S., at 29.

[19] As the District Court recognized in this case:

"The goal of voters such as plaintiff Eisenstat in states where Anderson will appear on the ballot is to amass enough electoral votes to elect Anderson. Ohio's deadline, by denying Anderson a place on the ballot, removes the sixth largest slate of electors from Anderson's reach and thereby reduces the total pool of electoral votes for which he may compete nationwide by 25 electors." 499 F. Supp., at 126.

[20] In approximately two-thirds of the States and the District of Columbia, filing deadlines for independent Presidential candidates occur in August or September. The deadlines in a number of other States are in June or July. Anderson was barred by early filing deadlines in Ohio and four other States; he succeeded in obtaining court orders requiring placement on the ballot in all five. See *supra,* at 784 and 786, and n. 6.

## III

The State identifies three separate interests that it seeks to further by its early filing deadline for independent Presidential candidates: voter education, equal treatment for partisan and independent candidates, and political stability. We now examine the legitimacy of these interests and the extent to which the March filing deadline serves them.

### Voter Education

There can be no question about the legitimacy of the State's interest in fostering informed and educated expressions of the popular will in a general election. Moreover, the Court of Appeals correctly identified that interest as one of the concerns that motivated the Framers' decision not to provide for direct popular election of the President.[21] We are persuaded, however, that the State's important and legitimate interest in voter education does not justify the specific restriction on participation in a Presidential election that is at issue in this case.

The passage of time since the Constitutional Convention in 1787 has brought about two changes that are relevant to the reasonableness of Ohio's statutory requirement that independents formally declare their candidacy at least seven months in advance of a general election. First, although it took days

---

[21] "The importance of this interest was made clear at the Constitutional Convention in 1787, where the delegates debated extensively the means of selecting the President. The alternatives that received the most attention in the early debates were appointment by the national legislature and election by the people at large. The former would have made it impossible to guarantee an independent executive. Election by the people was also disfavored, in part because of concern over the ignorance of the populace as to who would be qualified for the job." 664 F. 2d, at 563–564.

See *Williams* v. *Rhodes, supra,* at 43–44 (Harlan, J., concurring in result) ("The [Electoral] College was created to permit the most knowledgeable members of the community to choose the executive of a nation whose continental dimensions were thought to preclude an informed choice by the citizenry at large").

and often weeks for even the most rudimentary information about important events to be transmitted from one part of the country to another in 1787,[22] today even trivial details about national candidates are instantaneously communicated nationwide in both verbal and visual form. Second, although literacy was far from universal in 18th-century America,[23] today the vast majority of the electorate not only is literate but also is informed on a day-to-day basis about events and issues that affect election choices and about the ever-changing popularity of individual candidates. In the modern world it is somewhat unrealistic to suggest that it takes more than seven months to inform the electorate about the qualifications of a particular candidate simply because he lacks a partisan label.

Our cases reflect a greater faith in the ability of individual voters to inform themselves about campaign issues. In *Dunn* v. *Blumstein*, 405 U. S. 330 (1972), the Court considered the validity of a Tennessee statute requiring residence in the State for one year and in the county for three months as a prerequisite for registration to vote. The Court held the statute unconstitutional, specifically rejecting the argument that the requirements were justified by the State's interest in voter education.

> "Given modern communications, and given the clear indication that campaign spending and voter education occur largely during the month before an election, the State cannot seriously maintain that it is 'necessary' to reside for a year in the State and three months in the county in order to be knowledgeable about congressional, state, or even purely local elections." *Id.*, at 358 (footnotes omitted).

---

[22] See 1 A. Beveridge, The Life of John Marshall 250–287 (1916).

[23] See K. Lockridge, Literacy in Colonial New England 1–43, 72–87 (1974); L. Soltow & E. Stevens, The Rise of Literacy and the Common School in the United States: A Socioeconomic Analysis to 1870, pp. 28–57 (1981).

This reasoning applies with even greater force to a Presidential election, which receives more intense publicity.[24] Nor are we persuaded by the State's assertion that, unless a candidate actually files a formal declaration of candidacy in Ohio by the March deadline, Ohio voters will not realize that they should pay attention to his candidacy. Brief for Respondent 38. The validity of this asserted interest is undermined by the State's willingness to place major-party nominees on the November ballot even if they never campaigned in Ohio.

It is also by no means self-evident that the interest in voter education is served at all by a requirement that independent candidates must declare their candidacy before the end of March in order to be eligible for a place on the ballot in November. Had the requirement been enforced in Ohio, petitioner Anderson might well have determined that it would be futile for him to allocate any of his time and money to campaigning in that State. The Ohio electorate might thereby have been denied whatever benefits his participation in local debates could have contributed to an understanding of the issues. A State's claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism. As we observed in another First Amendment context, it is often true "that the best means to that end is to open the channels of communication rather than to close them." *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 770 (1976).[25]

---

[24] Cf. *Oregon* v. *Mitchell*, 400 U. S. 112 (1970) (upholding Act of Congress forbidding States to disqualify voters in Presidential elections for failure to meet state residency requirements).

[25] A similar analysis applies to the Court of Appeals' assertion that the State promotes informed voter choices by assuring that the voters are apprised "by a date certain of most of their options." 664 F. 2d, at 564–565. This reasoning assumes that the most relevant point of decision occurs in March, although the voter is not actually required to make a final choice among eligible candidates until November.

Moreover, as a matter of practical politics, the electoral process contains its own cure for voters' ignorance about a particular candidate. Unknown

*Equal Treatment*

We also find no merit in the State's claim that the early filing deadline serves the interest of treating all candidates alike. Brief for Respondent 33. It is true that a candidate participating in a primary election must declare his candidacy on the same date as an independent. But both the burdens and the benefits of the respective requirements are materially different, and the reasons for requiring early filing for a primary candidate are inapplicable to independent candidates in the general election.

The consequences of failing to meet the statutory deadline are entirely different for party primary participants and independents. The name of the nominees of the Democratic and Republican Parties will appear on the Ohio ballot in November even if they did not decide to run until after Ohio's March deadline had passed, but the independent is simply denied a position on the ballot if he waits too long.[26] Thus, under Ohio's scheme, the major parties may include all events preceding their national conventions in the calculus that produces their respective nominees and campaign platforms, but

---

candidates simply do not win large numbers of votes. A key goal of every political campaign is to promote the candidate's name identification among the electorate.

[26] It is true, of course, that Ohio permits "write-in" votes for independents. We have previously noted that this opportunity is not an adequate substitute for having the candidate's name appear on the printed ballot.

"It is suggested that a write-in procedure, under § 18600 *et seq.*, without a filing fee would be an adequate alternative to California's present filing-fee requirement. The realities of the electoral process, however, strongly suggest that 'access' via write-in votes falls far short of access in terms of having the name of the candidate on the ballot. . . . [A candidate] relegated to the write-in provision, would be forced to rest his chances solely upon those voters who would remember his name and take the affirmative step of writing it on the ballot." *Lubin* v. *Panish*, 415 U. S., at 719, n. 5.

Indeed, in the 1980 Presidential election, only 27 votes were cast in the State of Ohio for write-in candidates. 14 America Votes, *supra* n. 4, at 317.

the independent's judgment must be based on a history that ends in March.[27]

The early filing deadline for a candidate in a party's primary election is adequately justified by administrative concerns. Seventy-five days appears to be a reasonable time for processing the documents submitted by candidates and preparing the ballot. 499 F. Supp., at 134. The primary date itself must be set sufficiently in advance of the general election; furthermore, a Presidential preference primary must precede the national convention, which is regularly held during the summer. Finally, the successful participant in a party primary generally acquires the automatic support of an experienced political organization; in the Presidential contest he obtains the support of convention delegates.

Neither the administrative justification nor the benefit of an early filing deadline is applicable to an independent candidate. Ohio does not suggest that the March deadline is necessary to allow petition signatures to be counted and verified or to permit November general election ballots to be printed.[28] In addition, the early deadline does not corre-

[27] The Court of Appeals recognized the significance of the flexibility that results from being able to make a later decision, but concluded that the right to select a nominee for the Presidency at a convention conducted in the late summer is a right possessed by the political party, not a right possessed by the nominee personally. "By contrast," the court reasoned, "the independent's candidacy has no existence apart from that of the candidate, and no interest in flexibility in choosing its nominee." 664 F. 2d, at 567. Not only did the Court of Appeals err by ignoring the associational rights of voters who desire to support the independent's candidacy, but its rationale simply has no bearing on the State's asserted "equality" interest.

[28] Respondent conceded in the District Court that the nominating petitions filed on March 20 remain unprocessed in his office until June 15, when he transmits them to county boards of election. The boards do not begin to verify the signatures until the period July 1 to July 15. Finally, the Secretary of State does not certify the names of Presidential candidates, including independents, for inclusion on the ballot until late August, after the party nominating conventions. According to the District Court, based on the stipulated facts, it appears that no more than 75 days are necessary to perform these tasks. 499 F. Supp., at 133–134, 142.

spond to a potential benefit for the independent, as it does for the party candidate. After filing his statement of candidacy, the independent does not participate in a structured intraparty contest to determine who will receive organizational support; he must develop support by other means. In short, "equal treatment" of partisan and independent candidates simply is not achieved by imposing the March filing deadline on both. As we have written, "[s]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike." *Jenness* v. *Fortson*, 403 U. S. 431, 442 (1971).

## Political Stability

Although the Court of Appeals did not discuss the State's interest in political stability, that was the primary justification advanced by respondent in the District Court, 499 F. Supp., at 134, and it is again asserted in this Court. Respondent's brief explains that the State has a substantial interest in protecting the two major political parties from "damaging intraparty feuding." Brief for Respondent 41. According to respondent, a candidate's decision to abandon efforts to win the party primary and to run as an independent "can be very damaging to state political party structure." Anderson's decision to run as an independent, respondent argues, threatened to "splinter" the Ohio Republican Party "by drawing away its activists to work in his 'independent' campaign." *Id.*, at 37; see *id.*, at 44.

Ohio's asserted interest in political stability amounts to a desire to protect existing political parties from competition—competition for campaign workers, voter support, and other campaign resources—generated by independent candidates who have previously been affiliated with the party.[29] Our

---

[29] This particular interest in "political stability" must not be confused with the interest that is implicated by rules designed to prevent "party raiding," see n. 9, *supra*. That interest, sufficient to sustain the chal-

evaluation of this interest is guided by two of our prior cases, *Williams* v. *Rhodes* and *Storer* v. *Brown*.

In *Williams* v. *Rhodes* we squarely held that protecting the Republican and Democratic Parties from external competition cannot justify the virtual exclusion of other political aspirants from the political arena. Addressing Ohio's claim that it "may validly promote a two-party system in order to encourage compromise and political stability," we wrote:

> "The fact is, however, that the Ohio system does not merely favor a 'two-party system'; it favors two particular parties—the Republicans and the Democrats—and in effect tends to give them a complete monopoly. There is, of course, no reason why two parties should retain a permanent monopoly on the right to have people vote for or against them. Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms. New parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as the old parties have had in the past." *Williams* v. *Rhodes*, 393 U. S., at 31–32.

Thus in *Williams* v. *Rhodes* we concluded that First Amendment values outweighed the State's interest in protecting the two major political parties.

On the other hand, in *Storer* v. *Brown* we upheld two California statutory provisions that restricted access by inde-

---

lenged restriction in *Rosario* v. *Rockefeller*, 410 U. S. 752 (1973), is applicable only to party primaries; but this case involves restrictions on access to the general election ballot. Nor is it the same interest that justifies a rule disqualifying a person who voted in a party primary from signing a petition supporting the candidacy of an independent. Such a rule reflects a "policy of confining each voter to a single nominating act—either voting in the partisan primary or a signature on an independent petition." *Storer* v. *Brown*, 415 U. S., at 743; see *American Party of Texas* v. *White*, 415 U. S., at 785–786.

pendent candidates to the general election ballot. Under California law, a person could not run as an independent in November if he had been defeated in a party primary that year or if he had been registered with a political party within one year prior to that year's primary election. We stated that "California apparently believes with the Founding Fathers that splintered parties and unrestrained factionalism may do significant damage to the fabric of government," and that destruction of "the political stability of the system of the State" could have "profound consequences for the entire citizenry." 415 U. S., at 736. Further, we approved the State's goals of discouraging "independent candidacies prompted by short-range political goals, pique, or personal quarrel." *Id.*, at 735.

Thus in *Storer* we recognized the legitimacy of the State's interest in preventing "splintered parties and unrestrained factionalism." But we did not suggest that a political party could invoke the powers of the State to assure monolithic control over its own members and supporters.[30] Political competition that draws resources away from the major parties cannot, for that reason alone, be condemned as "unrestrained factionalism." Instead, in *Storer* we examined the two challenged provisions in the context of California's electoral system. By requiring a candidate to remain in the intraparty competition once the disaffiliation deadline had passed, and by giving conclusive effect to the winnowing process performed by party members in the primary election, the challenged provisions were an essential part of "a general state policy aimed at maintaining the integrity of the various routes to the ballot." Moreover, we pointed out that the

---

[30] Even though the drafting of election laws is no doubt largely the handiwork of the major parties that are typically dominant in state legislatures, it does not follow that the particular interests of the major parties can automatically be characterized as legitimate state interests.

policy "involves no discrimination against independents."
*Storer, supra,* at 733.

Ohio's challenged restriction is substantially different
from the California provisions upheld in *Storer.* As we have
noted, the early filing deadline does discriminate against in-
dependents. And the deadline is neither a "sore loser" pro-
vision nor a disaffiliation statute.[31] Furthermore, it is impor-
tant to recognize that *Storer* upheld the State's interest in
avoiding political fragmentation in the context of elections
wholly within the boundaries of California.[32] The State's in-
terest in regulating a nationwide Presidential election is not
nearly as strong; no State could singlehandedly assure "politi-
cal stability" in the Presidential context. The Ohio deadline
does not serve any state interest in "maintaining the integ-
rity of the various routes to the ballot" for the Presidency,
because Ohio's Presidential preference primary does not
serve to narrow the field for the general election. A major
party candidate who loses the Ohio primary, or who does not
even run in Ohio, may nonetheless appear on the November
general election ballot as the party's nominee. In addition,
the national scope of the competition for delegates at the
Presidential nominating conventions assures that "intraparty
feuding" will continue until August.

---

[31] Section 3513.25.7 is a filing deadline, not a "sore loser" statute. It
blocks access to the general election ballot 75 days before the primary, at a
time when, by definition, no candidate has yet lost the party primary.
Ohio has a separate "sore loser" statute, which is admittedly inapplicable to
Anderson because he made a timely withdrawal from the Ohio Republican
primary. See n. 2, *supra.* Furthermore, as the District Court observed,
"it is clear that R.C. 3513.257 acts as a disaffiliation provision only by mere
happenstance, not by any reasonably discernible legislative design." 499
F. Supp., at 135.

[32] Hall and Tyner, the Presidential and Vice Presidential candidates, ap-
parently complied with the one-year disaffiliation provision. *Storer,* 415
U. S., at 738. The disaffiliation statute was challenged by Storer and
Frommhagen, who wished to run as independents for the United States
House of Representatives.

More generally, the early filing deadline is not precisely drawn to protect the parties from "intraparty feuding," whatever legitimacy that state goal may have in a Presidential election. If the deadline is designed to keep intraparty competition within the party structure, its coverage is both too broad and too narrow. It is true that in this case § 3513.25.7 was applied to a candidate who had previously competed in party primaries and then sought to run as an independent. But the early deadline applies broadly to independent candidates who have not been affiliated in the recent past with any political party. On the other hand, as long as the decision to run is made before the March deadline, Ohio does not prohibit independent candidacies by persons formerly affiliated with a political party, or currently participating in intraparty competition in other States—regardless of the effect on the political party structure.

Moreover, the early deadline for filing as an independent may actually impair the State's interest in preserving party harmony. As Professor Bickel perceptively observed:

> "The characteristic American third party, then, consists of a group of people who have tried to exert influence within one of the major parties, have failed, and later decide to work on the outside. States in which there is an early qualifying date tend to force such groups to create minor parties without first attempting to influence the course taken by a major one. For a dissident group is put to the choice of foregoing major-party primary and other prenomination activity by organizing separately early on in an election year, or losing all opportunity for action as a third party later." Bickel, *supra* n. 11, at 87–88.

The same analysis, of course, is applicable to a "dissident group" that coalesces around an independent candidate rather than attempting to form a new political party.

We conclude that Ohio's March filing deadline for independent candidates for the office of President of the United

States cannot be justified by the State's asserted interest in protecting political stability.

> "For even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty. *Dunn* v. *Blumstein*, 405 U. S., at 343. 'Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.' *NAACP* v. *Button*, 371 U. S. [415], 438 [(1963)]. If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Kusper* v. *Pontikes*, 414 U. S. 51, 58–59 (1973).

## IV

We began our inquiry by noting that our primary concern is not the interest of candidate Anderson, but rather, the interests of the voters who chose to associate together to express their support for Anderson's candidacy and the views he espoused. Under any realistic appraisal, the "extent and nature" of the burdens Ohio has placed on the voters' freedom of choice and freedom of association, in an election of nationwide importance, unquestionably outweigh the State's minimal interest in imposing a March deadline.

The judgment of the Court of Appeals is

*Reversed.*

JUSTICE REHNQUIST, with whom JUSTICE WHITE, JUSTICE POWELL, and JUSTICE O'CONNOR join, dissenting.

Article II of the Constitution provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" who shall select the President of the United States. U. S. Const., Art. II, § 1, cl. 2. This provision, one of few in the Constitution that grants an express plenary power to the States, conveys "the broadest power of determination" and "[i]t recognizes that [in the

election of a President] the people act through their representatives in the legislature, and *leaves it to the legislature exclusively to define the method of effecting the object.*" *McPherson* v. *Blacker*, 146 U. S. 1, 27 (1892) (emphasis added).

In exercising this power, the Ohio Legislature has provided alternative routes to its general election ballot for capture of Ohio's Presidential electoral votes. *Political parties* can earn the right to field a Presidential candidate in the general election in one of two ways. Parties that obtained at least 5% of the vote in the preceding gubernatorial or Presidential election are automatically entitled to have a candidate on the general election ballot. Other political parties are required to file 120 days before the primary election (in 1980 the date was February 4) a statement of intent to participate in the primary, together with petitions containing signatures of voters equal to 1% of the votes cast in the last gubernatorial or Presidential election (in 1980 approximately 28,000 signatures would have been required). Ohio Rev. Code Ann. § 3517.01 (Supp. 1982).

Ohio also offers *candidates* different routes to the general election ballot. Should a candidate decide to seek the nomination of a political party participating in Ohio's primary election by capturing delegate votes for the party's national convention, the candidate must file a declaration of candidacy and a nominating petition bearing signatures from 1,000 members of the party; the filing must occur no later than the 75th day before the first Tuesday after the first Monday in June of the election year (in 1980 the date was March 20). Ohio Rev. Code Ann. § 3513.05 (Supp. 1982). Of course, because a political party has earned the right to put on the ballot a candidate chosen at its national convention, a candidate seeking the nomination of that party could forgo the Ohio primary process and, if he should win at the national convention, still be placed on the ballot as a party candidate. If a candidate chooses to run as a nonparty candidate, he must file, by

the same date as a party candidate participating in the primary, a statement of candidacy and a nominating petition bearing the signatures of 5,000 qualified voters. Ohio Rev. Code Ann. § 3513.25.7 (Supp. 1982). Since a nonparty candidate does not participate in a national convention, obviously he cannot benefit from the routes made available to political parties.

Today the Court holds that the filing deadline for nonparty candidates in this statutory scheme violated the First Amendment rights of 1980 Presidential hopeful John Anderson and Anderson's supporters. Certainly, absent a court injunction ordering that his name be placed on the ballot, Anderson and his supporters would have been injured by Ohio's ballot access requirements; by failing to comply with the filing deadline for nonparty candidates Anderson would have been excluded from Ohio's 1980 general election ballot.[1] But the Constitution does not require that a State allow any particular Presidential candidate to be on its ballot, and so long as the Ohio ballot access laws are rational and allow nonparty candidates reasonable access to the general election ballot, this Court should not interfere with Ohio's exercise of its Art. II, § 1, cl. 2, power. Since I believe that the Ohio laws meet these criteria, I dissent.

In support of its conclusion that Ohio's filing deadline "may have a substantial impact on independent-minded voters," *ante*, at 790, the Court explains that "[i]f the State's filing deadline were later in the year, a newly emergent independent candidate could serve as the focal point for a grouping of

---

[1] Anderson would not have been totally excluded from participating in the general election since Ohio allows for "write-in" candidacies. The Court suggests, however, that this is of no relevance because a write-in procedure "is not an adequate substitute for having the candidate's name appear on the printed ballot." *Ante*, at 799, n. 26. Until today the Court had not squarely so held and in fact in earlier decisions the Court had treated the availability of write-in candidacies as quite relevant. See *Storer* v. *Brown*, 415 U. S. 724, 736, n. 7 (1974).

Ohio voters." *Ante*, at 791. In addition, the Court says: "Not only does the challenged Ohio statute totally exclude any candidate who makes the decision to run for President as an independent after the March deadline, it also burdens the signature-gathering efforts of independents who decide to run in time to meet the deadline." *Ante*, at 792. Finally, the Court intimates that the effect of the filing deadline for nonparty candidates is that election campaigns are "monopolized by the existing political parties." *Ante*, at 794. While if true these findings might provide a basis for finding a substantial impact on nonparty candidates and their supporters, the Court's conclusions are simply unsupported by the record in this case.

Anderson makes no claim, and thus has offered no evidence to show, that the early filing deadline impeded his "signature-gathering efforts." That alone should be enough to prevent the Court from finding that the deadline has such an impact. A statute "is not to be upset upon hypothetical and unreal possibilities, if it would be good upon the facts as they are." *Pullman Co.* v. *Knott*, 235 U. S. 23, 26 (1914). What information the record does contain on this point leads to a contrary conclusion. The record shows that in 1980 five independent candidates submitted nominating petitions with the necessary 5,000 signatures by the March 20 deadline and thus qualified for the general election ballot in Ohio. See *ante*, at 791–792, n. 12. The Court of Appeals found that this number of nonparty candidates was not unusual in Ohio. 664 F. 2d 554, 565, n. 14 (1981). The importance of this kind of evidence was noted in *Storer* v. *Brown*, 415 U. S. 724 (1974), where the Court said: "Past experience will be a helpful, if not always an unerring, guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not." *Id.*, at 742. The most obvious conclusion to be drawn from "past experience" in this case is that a "reasonably diligent independent candidate" choosing to take Ohio's nonparty route has little

difficulty in obtaining the necessary signatures in a timely fashion. See *ibid.*[2]

The Court's intimation that the Ohio filing deadline infringes on a nonparty candidate who makes the decision to run for President after the March deadline is similarly without support in the record.[3] Certainly, if such candidates emerge, the Ohio deadline will prevent their running in the general election as nonparty candidates. Just as certainly, however, Anderson was not such a candidate. Anderson formally announced his candidacy for the Presidency on June 8, 1979—over nine months before Ohio's March 20 deadline. And the record does not reveal the existence of any other in-

---

[2] Furthermore, as the Court of Appeals pointed out, one could speculate that nonparty candidates would have more difficulty meeting the signature requirements of various States if the States had less discretion in setting their own deadlines. "We also note that the effect of limiting the states' discretion would be to require uniformity, thus compressing the signature gathering and campaigning requirements in the various states. This would greatly increase the burden on all candidates, who may presently devote their scarce resources to a few states at a time." 664 F. 2d 554, 565, n. 13 (1981).

[3] It would seem that realistically speaking, there is little chance in these modern times of a serious candidate for the Presidency making his decision to run after the spring of the election year. We might judicially take notice that it is presently the spring of the year preceding an election year and numerous candidates have already thrown their hats into the campaign ring. For proof of a contrary point, the Court cites by reference to the candidacies of Martin Van Buren in 1848, James B. Weaver in 1892, Theodore Roosevelt in 1912, and Robert La Follette in 1924. *Ante,* at 792, n. 13. The most obvious response is that the method of Presidential campaigning has so changed since the last of these campaigns that such candidacies are not as likely to arise today. It also should be noted that most, if not all, of these men decided to seek the Presidency far in advance of their actual nomination. Finally, none of these individuals were elected in the years in question and those who split from their political parties may well have been responsible for the election going to a different party, a result which this Court, in *Storer* v. *Brown, supra,* said States were at liberty to try to avoid.

dividual who decided to become a nonparty Presidential candidate after the March 20 deadline. In fact, as noted above, the five individuals who did seek electoral votes through the nonparty alternative had no trouble making this decision before the filing deadline and had no trouble qualifying for a position on the general election ballot.

Finally, there is nothing in the record to indicate that this is a case where "independent-minded voters" are prevented from rallying behind a candidate selected later in the election year so as to guarantee "major parties" a monopoly on the election process. Like-minded voters who do not want to participate in an existing political party are at complete liberty to form a new political party and obtain for themselves the same flexibility that established political parties have in the selection of their nominee for President. It is true that Ohio provides this benefit only where a group of voters acts with some foresight and shows a degree of support among the electorate, but this case presents no challenge to these requirements.

On the record before us, the effect of the Ohio filing deadline is quite easily summarized: it requires that a candidate, who has already decided to run for President, decide by March 20 which route his candidacy will take. He can become a nonparty candidate by filing a nominating petition with 5,000 signatures and assure himself a place on the general election ballot. Or he can become a party candidate and take his chances in securing a position on the general election ballot by seeking the nomination of a party's national convention. Anderson chose the latter route and submitted in a timely fashion his nominating petition for Ohio's Republican Primary. Then, realizing that he had no chance for the Republican nomination, Anderson sought to change the form of this candidacy. The Ohio filing deadline prevented him from making this change. Quite clearly, rather than prohibiting him from seeking the Presidency, the filing deadline only pre-

vented Anderson from having two shots at it in the same election year.

Thus, Ohio's filing deadline does not create a restriction "denying the franchise to citizens," such as those faced by the Court in *Kramer* v. *Union School District*, 395 U. S. 621, 626 (1969) (emphasis omitted), *Cipriano* v. *City of Houma*, 395 U. S. 701 (1969) *(per curiam)*, *Evans* v. *Cornman*, 398 U. S. 419 (1970), *Phoenix* v. *Kolodziejski*, 399 U. S. 204 (1970), and *Dunn* v. *Blumstein*, 405 U. S. 330 (1972). Likewise, Ohio's filing deadline does not create a restriction that makes it "virtually impossible" for new-party candidates or nonparty candidates to qualify for the ballot, such as those addressed in *Williams* v. *Rhodes*, 393 U. S. 23, 25 (1968), *Bullock* v. *Carter*, 405 U. S. 134 (1972), and *Lubin* v. *Panish*, 415 U. S. 709 (1974). Yet in deciding this case, we are not without guidance from prior decisions by this Court.

In *Storer* v. *Brown*, the Court was faced with a California statute prohibiting an independent candidate from affiliating with a political party for 12 months preceding the primary election. This required a prospective candidate to decide on the form of his candidacy at a date some eight months earlier than Ohio requires. In upholding, in the face of a First Amendment challenge, this disaffiliation statute and a statute preventing candidates who had lost a primary from running as independents, the Court determined that the laws were "expressive of a general state policy aimed at maintaining the integrity of various routes to the ballot," 415 U. S., at 733, and that the statutes furthered "the State's interest," described by the Court as "compelling," "in the stability of its political system." *Id.*, at 736. The Court explained its holding, saying:

> "The State's general policy is to have contending forces within the party employ the primary campaign and primary election to finally settle their differences. The general election ballot is reserved for major struggles; it

is not a forum for continuing intraparty feuds. The provision against defeated primary candidates running as independents effectuates this aim, the visible result being to prevent the losers from continuing the struggle and to limit the names on the ballot to those who have won the primaries and those independents who have properly qualified. The people, it is hoped, are presented with understandable choices and the winner in the general election with sufficient support to govern effectively.

"[The disaffiliation statute] carries very similar credentials. It protects the direct primary process by refusing to recognize independent candidates who do not make early plans to leave a party and take the alternative course to the ballot. *It works against independent candidacies prompted by short-range political goals, pique, or personal quarrel. It is also a substantial barrier to a party fielding an 'independent' candidate to capture and bleed off votes in the general election that might well go to another party.*

"A State need not take the course California has, but California apparently believes with the Founding Fathers that splintered parties and unrestrained factionalism may do significant damage to the fabric of government. See The Federalist, No. 10 (Madison). *It appears obvious to us that the one-year disaffiliation provision furthers the State's interest in the stability of its political system. We also consider that interest as not only permissible, but compelling and as outweighing the interest the candidate and his supporters may have in making a late rather than early decision to seek independent ballot status.* . . . [T]he Constitution does not require the State to choose ineffectual means to achieve its aims. To conclude otherwise might sacrifice the political stability of the system of the State, with profound consequences for the entire citizenry, merely in the in-

terest of particular candidates and their supporters having instantaneous access to the ballot." *Id.*, at 735–736 (emphasis added).

The similarities between the effect of the Ohio filing deadline and the California disaffiliation statute are obvious.

Refusing to own up to the conflict its opinion creates with *Storer,* the Court tries to distinguish it, saying that it "did not suggest that a political party could invoke the powers of the State to assure monolithic control over its own members and supporters." *Ante,* at 803. The Court asserts that the Ohio filing deadline is more like the statutory scheme in *Williams* v. *Rhodes, supra,* which was designed to protect "'two particular parties—the Republicans and the Democrats—and in effect tends to give them a complete monopoly.'" *Ante,* at 802 (quoting *Williams* v. *Rhodes,* 393 U. S., at 32). See also *ante,* at 802 ("In *Williams* v. *Rhodes* we squarely held that protecting the Republican and Democratic Parties from external competition cannot justify the virtual exclusion of other political aspirants from the political arena." But see *Buckley* v. *Valeo,* 424 U. S. 1 (1976) *(per curiam)).* "Ohio's asserted interest in political stability," says the Court, "amounts to a desire to protect existing political parties from competition." *Ante,* at 801. But this simply is not the case. The Ohio filing deadline in no way makes it "virtually impossible," 393 U. S., at 25, for new parties or nonparty candidates to secure a position on the general election ballot. It does require early decisions. But once a decision is made, there is no claim that the additional requirements for new parties and nonparty candidates are too burdensome. In fact, past experience has shown otherwise. What the Ohio filing deadline prevents is a candidate such as Anderson from seeking a party nomination and then, finding that he is rejected by the party, bolting from the party to form an independent candidacy. This is precisely the same behavior that California sought to prevent by the disaffiliation statute this Court upheld in *Storer.*

The Court makes other attempts to distinguish this case from the obviously similar *Storer* case. The Court says Ohio has no interest in preventing "intraparty feuding" because by the nature of the Presidential nominating conventions "'intraparty feuding' will continue until August." *Ante*, at 804.[4] This is certainly no different than the situation in *Storer*. Essentially all of the battles for party nominations in California would have taken place during the 12 months before the party primaries—the period during which an independent candidate had to be disaffiliated with any party.

The Court further notes: "*Storer* upheld the State's interest in avoiding political fragmentation in the context of elections wholly within the boundaries of California. The State's interest in regulating a nationwide Presidential election is not nearly as strong." *Ante*, at 804 (footnote omitted). The Court's characterization of the election simply is incorrect. The Ohio general election in 1980, among other things, was for the appointment of Ohio's representatives to the electoral college. U. S. Const., Art. II, § 1, cl. 2. The Court throughout its opinion fails to come to grips with this fact. While Ohio may have a lesser interest in who is ultimately selected by the electoral college, its interest in who is supported by its own Presidential electors must be at least as strong as its interest in electing other representatives. While the Presidential electors may serve a short term and may speak only one time on behalf of the voters they repre-

---

[4] The Court seeks comfort from the idea that the filing deadline is not a "sore loser" statute which prevents a candidate who is defeated in a primary from running as an independent candidate. *Ante*, at 804, n. 31. But the effect of the deadline in this case is much the same. Under the Court's approach, so long as a candidate pulls out of his party race before the votes of the party are counted, he must be recognized as a "newly emergent independent candidate" whose candidacy is created by a dramatic change in national events. To the contrary, I submit that such a candidate is no more than a "sore loser" who ducked out before putting his popularity to the vote of his party.

sent, their role in casting Ohio's electoral votes for a President may be second to none in importance. See *Burroughs v. United States*, 290 U. S. 534, 545 (1934).

The Court suggests that *Storer* is not controlling since in that case the Court held that the California disaffiliation statute was not discriminatory because party candidates were prohibited from affiliating with another political party for the 12 months preceding the primary election. The Court says that Ohio's filing deadline does discriminate against nonparty candidates. But merely saying it is so does not make it so. As explained later, nonparty candidates and party candidates wishing to participate in Ohio's primary election must file on the same date. It is true that party candidates can obtain a place on the general election ballot without participating in the primary by obtaining a party's nomination at its national convention. But this is a benefit given to the party and only incidentally received by the winning party candidate; it provides no benefit to one who seeks but fails to obtain a party nomination. On the whole, party candidates have a more difficult chore in getting a place on the general election ballot than do nonparty candidates; a fact of which Anderson and other unsuccessful rivals for the 1980 Republican nomination are doubtless aware. Nonparty candidates, if they file in time and submit the necessary nominating petitions, are assured of a place on the ballot; party candidates must win a party nomination.

In a final attempt to distinguish *Storer*, the Court argues that even if Ohio is serving some interest in preventing "intraparty feuding," the filing deadline is "both too broad and too narrow"; the Court even argues that the filing deadline may in fact impair this interest. *Ante*, at 805. The Court claims that the effect of the deadline is too broad because it applies "to independent candidates who have not been affiliated in the recent past with any political party." *Ibid.* Its effect is too narrow because it "does not prohibit independent candidacies by persons formerly affiliated with

a political party, or currently participating in intraparty competition." *Ibid.* The Court says the filing deadline may impair the States' interest in preserving political stability because it may force independent-minded voters "'to create minor parties without first attempting to influence the course taken by a major one.'" *Ibid.* (quoting A. Bickel, Reform and Continuity 87–88 (1971)). But *each* of these criticisms could have been asserted against the California disaffiliation statute.

The point the Court misses is that in cases like this and *Storer*, we have never required that States meet some kind of "narrowly tailored" standard in order to pass constitutional muster. In reviewing election laws like Ohio's filing deadline, we have said before that a court's job is to ensure that the State "in no way freezes the status quo, but implicitly recognizes the potential fluidity of American political life." *Jenness* v. *Fortson*, 403 U. S. 431, 439 (1971). If it does not freeze the status quo, then the State's laws will be upheld if they are "tied to a particularized legitimate purpose, and [are] in no sense invidious or arbitrary." *Rosario* v. *Rockefeller*, 410 U. S. 752, 762 (1973). See also *Marston* v. *Lewis*, 410 U. S. 679 (1973) *(per curiam); Burns* v. *Fortson*, 410 U. S. 686 (1973) *(per curiam); American Party of Texas* v. *White*, 415 U. S. 767 (1974); *Mandel* v. *Bradley*, 432 U. S. 173 (1977) *(per curiam); Clements* v. *Fashing*, 457 U. S. 957 (1982). The Court tries to avoid the rules set forth in some of these cases, saying that such rules were "applicable only to party primaries" and that "this case involves restrictions on access to the general election ballot." *Ante*, at 802, n. 29. The fallacy in this reasoning is quite apparent: one cannot restrict access to the primary ballot without also restricting access to the general election ballot. As the Court said in *Storer* v. *Brown:* "The direct party primary in California is not merely an exercise or warm-up for the general election but an integral part of the entire election process, the initial stage in a two-stage process by which the people

choose their public officers. It functions to winnow out and finally reject all but the chosen candidates." 415 U. S., at 735 (footnote omitted).

The Ohio filing deadline easily meets the test described above. In the interest of the "stability of its political system," *Storer* v. *Brown*, 415 U. S., at 736, Ohio must be "free to assure itself that [a nonparty] candidate is a serious contender, *truly independent*, and with a satisfactory level of community support." *Id.*, at 746. This interest alone is sufficient to support Ohio ballot access laws which require that candidates for Presidential electors choose their route early, thus preventing a person who has decided to run for a party nomination from switching to a nonparty candidacy after he discovers that he is not the favorite of his party. But this is not the only interest furthered by Ohio's laws.

Ohio maintains that requiring an early declaration of candidacy gives its voters a better opportunity to take a careful look at the candidates and see how they withstand the close scrutiny of a political campaign. The Court does not dispute the legitimacy of this interest. But the Court finds that "the State's important and legitimate interest in voter education does not justify the specific restriction on participation in a Presidential election that is at issue in this case." *Ante*, at 796. Admitting that the Constitutional Convention in 1787, in establishing the electoral college and providing plenary authority to the States for election of its members to the college, had a heightened awareness of the importance of an informed electorate, the Court tells us how times have changed in the past 200 years and how the problem of ensuring an informed electorate is no longer so great. The Court explains: "In the modern world it is somewhat unrealistic to suggest that it takes more than seven months to inform the electorate about the qualifications of a particular candidate . . . . Our cases reflect a greater faith in the ability of individual voters to inform themselves about campaign issues." *Ante*, at 797.

I cannot agree with the suggestion that the early deadline reflects a lack of "faith" in the voters. That Ohio wants to

give its voters as much time as possible to gather information on the potential candidates would seem to lead to the contrary conclusion. There is nothing improper about wanting as much time as possible in which to evaluate all available information when making an important decision. Besides, the Court's assertion that it does not take 7 months to inform the electorate is difficult to explain in light of the fact that Anderson allowed himself some 19 months to complete this task; and we are all well aware that Anderson's decision to make an early go of it is not atypical. The Court's reliance on the quote from *Dunn* v. *Blumstein*, 405 U. S., at 358, that campaign spending and voter education occur "largely during the month before an election" cannot be taken seriously when applied to Presidential campaigns. I see no basis whatsoever for the Court's conclusion that "[t]his reasoning applies with even greater force to a Presidential election." *Ante*, at 798.

"In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation." *Buckley* v. *Valeo*, 424 U. S., at 14–15. This is especially true in the context of candidates for President. "The President is vested with the executive power of the nation. The importance of his election and the vital character of its relationship to and effect upon the welfare and safety of the whole people cannot be too strongly stated." *Burroughs* v. *United States*, 290 U. S., at 545. I believe the Court of Appeals aptly explained the present day need in saying:

"To be sure, some of the impediments to an informed electorate that existed in 1787 have been removed by our extensive present day communications network, through which news of a candidacy is transmitted nationwide virtually simultaneously with its announcement. However, rapid communication can only inform the electorate of the existence of a candidacy. Equally crucial to a meaningful vote is the electorate's ability to evaluate

those who would be President once aware of their desire to fill the post. Ohio may very reasonably conclude that requiring Presidential candidates to be in the public eye for a significant time materially advances its interest in careful selection." 664 F. 2d, at 564.[5]

Ohio also has an interest in assisting its citizens in apportioning their resources among various candidates running for the Presidency. The supply of resources needed for operating a political campaign is limited; this is especially true of two of the most important commodities, money and volunteers. By doing its best to present the field of candidates by spring, right at the time that campaigns begin to intensify, Ohio allows those of its citizens who want to provide support other than voting, adequate time to decide how to divide up that support. While the Court does not give attention to this interest, it is certainly a legitimate one and an important one in terms of the effective campaigning of Presidential candidates.

The Court seems to say that even if these interests would otherwise be served by Ohio's filing deadline, they are "undermined by the State's willingness to place major-party nominees on the November ballot even if they never campaigned in Ohio." *Ante,* at 798. The Court fails to follow its own warning that "'[s]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike.'" *Ante,* at 801 (quoting *Jenness* v. *Fortson,* 403 U. S., at 442). Underlying the Court's entire opinion is the idea that "independent candidates" are treated differently than candidates fielded by the "major parties." But this observation is no more productive than comparing

---

[5] The Ohio Legislature's decision is not that different from the decision by the Federal Government requiring television networks to provide early access for Presidential candidates. Recently, in *CBS, Inc.* v. *FCC,* 453 U. S. 367 (1981), this Court held that under the Federal Communications Act a Presidential candidate had a right to television access as early as December 1979, some 11 months before the election.

apples and oranges and wondering at the difference between them.

First of all, *any political party, major, minor, or otherwise,* can qualify for a position on Ohio's general election ballot and have that position held open until later in the election year. The reasonableness of this approach is fairly obvious. Political parties have, or at least hope to have, a continuing existence, representing particular philosophies. Each party has an interest in finding the best candidate to advance its philosophy in each election. See *Cousins* v. *Wigoda,* 419 U. S. 477 (1975); *Democratic Party* v. *Wisconsin ex rel. La Follette,* 450 U. S. 107 (1981). The Court suggests that if such a procedure is so important for political parties, then followers of a particular candidate should also have more time. See, *e. g., ante,* at 800, n. 27. This argument simply does not wash. Any group of like-minded voters, if they are of sufficient numbers, is free to form a political party and ensure more time in selecting a candidate to express their views. But followers of a particular candidate need no time to find such a representative; they are organized around that candidate. Such followers have no real organized existence in the absence of that particular candidate.

Comparing party candidates and nonparty candidates is somewhat more useful, but does not change the result. Any candidate wanting to pursue his place on the Ohio general election ballot through Ohio's preliminary procedures must file at the same time. Nevertheless, should an individual who has not filed a statement of candidacy be chosen by a political party as its nominee, Ohio does not attempt to keep that candidate off of its general election ballot. To the extent that this is an advantage to the successful party candidate, however, it is a benefit given to the party, which the party candidate only receives incidentally.[6] Furthermore,

---

[6] The Court says that nevertheless this exposes a serious weakness in the State's claim that it wants to put all the candidates before its voters

to the extent the party candidate is benefited, such benefit is counterbalanced by the risk he takes of not getting the party nomination at all. Only the nonparty candidate can assure himself of a place on the general election ballot. Many party candidates may seek the party's nomination, but only one of them will get it.

The Court's decision in this case is not necessary for the protection of like-minded voters who want to support an independent candidate; Ohio laws already protect such voters. This case presents a completely different story. John Anderson decided some 19 months before the 1980 general election to run for President. He decided to run as a Republican Party candidate. When Anderson sought to get on the Ohio ballot after the March 20 deadline, he was not a "newly emergent independent candidate" whose candidacy had been created by dramatic changes in the election campaign. He was a party candidate who saw impending rejection by his party and rather than throw his support to the party's candidate or some other existing candidacy, Anderson wanted to bolt and have a second try.

---

early so they will have time to evaluate the candidates. Even if the Court were correct, the other interests advanced by the State would justify the filing deadline for nonparty candidates. But I do not believe the Court is correct.

The Court ignores the fact that voters learn about a nonparty candidacy only by listening to what the candidate has to say. Reality requires a different conclusion about party candidates. Even before a party candidate is chosen, the public will know a great deal about that candidate because of its knowledge about the party. Of course, the Court is correct that the focus of a party will vary somewhat according to the candidate chosen. But this proves only that the time between the choosing of the party's nominee and the general election should be sufficient to allow the voters to evaluate the party's candidate. It does not prove that the voters need as much time evaluating the party candidate as they need for an individual who does not run as the representative of any particular established views. It would in fact be quite reasonable for a State to require, in furtherance of its voter education interest, that the nonparty candidate put himself before the public at an earlier time than it requires of the party candidate.

The Court's opinion protects this particular kind of candidate—an individual who decides well in advance to become a Presidential candidate, decides which route to follow in seeking a position on the general election ballot, and, after seeing his hopes turn to ashes, wants to try another route. The Court's opinion draws no line; I presume that a State must wait until all party nominees are chosen and then allow all unsuccessful party candidates to refight their party battles by forming an "independent" candidacy. I find nothing in the Constitution which requires this result. For this reason I would affirm the judgment of the Court of Appeals.