**Sa'ad EL–AMIN, et al., Plaintiffs,**

v.

**STATE BD. OF ELECTIONS, et al., Defendants.**

**Civ. A. No. 89–0392–R.**

United States District Court,
E.D. Virginia,
Richmond Division.

Aug. 7, 1989.

Sa'ad El–Amin, Richmond, Va., for plaintiffs.

William H. Hauser, and K. Marshall Cook, Sr. Asst. Attys. Gen., Greg Haley, Asst. Atty. Gen., Richmond, Va., for defendants.

### MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

This case is before the Court on the defendants' motion to dismiss or for sum-

mary judgment. The parties agree that there is no genuine issue of material fact, disputing only which side is entitled to judgment as a matter of law. *See* Fed.R. Civ.P. 56(c).

## I

Virginia Code § 24.1–167 requires candidates for most state, city and county offices to file a financial disclosure statement by 5:00 p.m. on the Friday immediately following the second Tuesday in June, in this case June 16, 1989. A 1988 amendment to the statute eliminated the State Board of Elections' authority to grant extensions of the deadline. The statement requires candidates to disclose various sources of income, such as gifts and honoraria, as well as major investments and liabilities and other financial interests. The State Board of Elections keeps the forms on file for public examination throughout the campaign, but does not itself review them for any purpose.

Any candidate who fails to file the disclosure form and other required forms by the deadline will not be listed on the official November ballot, though he or she may run as a write-in candidate without filing any forms at all. In 1989, 465 candidates met the deadlines: 180 Democrats, 104 Republicans, and 181 independents. Six candidates were disqualified for failing to file the required forms on time.

Incumbents are exempt from the financial disclosure requirement if they have complied with Va.Code §§ 2.1–639.13, 2.1–639.14, and 2.1–639.40. Those sections require officeholders to file the same disclosure statement by January 15 of each year. Incumbents who miss the January deadline suffer no penalty, but like other candidates must file the statement by the June deadline. Any candidate, whether incumbent or not, may satisfy the requirement in an election year by filing the statement at any time from January 1 through the June deadline.

Sa'ad El–Amin announced his candidacy as an independent for Commonwealth's Attorney for the City of Richmond, an office subject to the financial disclosure require-

ment, on April 3, 1989. He obtained a "candidate package" from the State Board of Elections, a freely distributed package of calendars, deadline notices and required forms. No financial disclosure form was included in the package, but various other forms mentioned the disclosure form and the June 16 deadline. He filed the other forms on time, but inadvertently failed to file the disclosure form by 5:00 p.m. on June 16.

A newspaper reporter reminded El–Amin the following Monday, June 19, that El–Amin had missed the deadline and therefore would not be on the official ballot, and El–Amin filed the form the same day. When Susan Fitz–Hugh, the Secretary of the Board of Elections, told El–Amin that she lacked statutory authority either to accept his late filing or to grant an extension, El–Amin brought this suit claiming that the disclosure provisions violated constitutional guarantees of equal protection, due process and freedom of speech and association.

After the Court denied El–Amin's motion for a temporary restraining order, he filed an amended complaint adding as plaintiffs three registered voters who support his candidacy. They alleged that the Board's refusal to print El–Amin's name on the ballot violated their first amendment rights to vote for El–Amin. The state promptly filed its motion to dismiss or for summary judgment.

## II

As an initial matter, the Supreme Court has not been entirely consistent in its review of access-to-ballot claims. Some cases apply a form of equal protection analysis, assessing the regulation's disparate effects on different recognizable groups of voters. *See, e.g., Clements v. Fashing,* 457 U.S. 957, 962–63, 102 S.Ct. 2836, 2843–44, 73 L.Ed.2d 508 (1982) (upholding restrictions forbidding incumbents from running for other offices); *Bullock v. Carter,* 405 U.S. 134, 140, 92 S.Ct. 849, 854, 31 L.Ed.2d 92 (1972) (invalidating filing fees because they disproportionately burden poorer candidates). More recently, the Court has focused on whether such regulations burden

first amendment freedoms of speech and association. *See, e.g., Eu v. San Francisco Democratic Central Committee,* 489 U.S. ——, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989); *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). The Fourth Circuit recently chose the latter approach based on the particular statute and claims at issue. *Dixon v. Maryland State Admin. Bd. of Election Laws,* 878 F.2d 776, 779–80 (4th Cir.1989).

In this case, first amendment analysis appears more appropriate because it would require more of the Virginia statute. The plaintiffs claim that the statute denies equal protection only because they allege that incumbents receive preferential treatment. Even if the statute draws such a distinction, as discussed *infra,* the Court could not scrutinize it strictly because it does not make a "suspect classification." In contrast, if El–Amin correctly portrays this statute as explicitly entrenching current officeholders against electoral attack, the statute would have to pass exacting review under the first amendment.

El–Amin might also benefit from strict equal protection scrutiny if he can claim violation of a "fundamental right," but he cannot assert a right to be a candidate at all, much less to have his name printed on the official ballot rather than to run as a write-in candidate. *See Dixon,* 878 F.2d at 779; *Clements,* 457 U.S. at 963, 102 S.Ct. at 2843; *Bullock,* 405 U.S. at 143, 92 S.Ct. at 856. The other plaintiffs, who claim a violation of their right to vote for El–Amin, might be able to demonstrate a fundamental right, *see Bullock,* 405 U.S. at 143, 92 S.Ct. at 856, but if the statute burdens their rights the Court would examine the statute no less strictly under the first amendment. Because on El–Amin's equal protection claim the Court would largely review the statute only for a "rational basis," the first amendment requires much closer scrutiny than does the fourteenth. If the statute survives a first amendment balancing test, then the equal protection claim also lacks merit because (on these facts) the latter doctrine places no greater restraints on the state.

## III

■ The associational right at issue in this case is not so much El–Amin's individual right to be a candidate, but the other plaintiffs' right to vote for him. *Clements,* 457 U.S. at 963, 102 S.Ct. at 2843; *Bullock,* 405 U.S. at 143, 92 S.Ct. at 856. Election regulations that prevent some candidates from running narrow the field and limit voters' choices; it is this restriction on the fundamental right to vote, not the burden on a particular candidate, that violates the Constitution. The concern is particularly pointed when a statute "limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." *Anderson,* 460 U.S. at 793, 103 S.Ct. at 1572; *see also* Tribe, *Constitutional Law* § 13.19 at 1100 (2d ed. 1988) (collecting cases and concluding that the Supreme Court applies strict scrutiny only where regulations "effectively deny a cognizable group a meaningful right to representation."). For example, the March deadline in *Anderson* applied only to independent candidates and thereby denied an effective vote to those voters who are not content with the agendas of the two major parties. Similarly, the filing fee required by Texas in *Bullock* precluded poor candidates and constituencies from participating in the electoral process regardless of how qualified or popular those candidates may have been. The question in this case, therefore, is whether the fixed June deadline impermissibly burdens a particular segment of the electorate or, more generally, limits voters' ability to exercise fully their right to vote.

Though the state cannot regulate elections with such a heavy hand that it denies full political participation, the right to vote would be equally compromised if the state were not permitted some latitude in ensuring that elections are fair and honest, and that voters have an opportunity to make informed choices as well as numerous ones. These "important regulatory interests [in assuring fair and honest elections] are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Anderson,*

460 U.S. at 788, 103 S.Ct. at 1570. Courts reviewing state election laws must keep the voters' interests foremost, and in balancing the plaintiffs' claim against the statute must determine whether those collective interests are better promoted by the state's statutory effort or the plaintiffs' constitutional arguments.

The *Anderson* Court established the following familiar framework for evaluating these competing approaches: the Court must first assess the "character and magnitude of the asserted injury" to the plaintiffs' first amendment rights, and then evaluate the "legitimacy and strength" of the state's interests and their need to burden the plaintiffs' rights. *Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570.

The plaintiffs' complaint does not clearly articulate the right they claim was violated, but moves to the second prong of the *Anderson* test, claiming that the state has no compelling interest in the June 16 deadline and that less restrictive alternatives are available (for example, providing extensions). Essentially, the complaint charges that the statute violates the first amendment because the strict deadline unnecessarily limits voters' choices without advancing their concededly important interest in fair, honest and informed campaigns.

IV

Concerning the first prong of the *Anderson* test, the Virginia statute does place some burden on the plaintiffs' first amendment rights. Any candidate who misses the filing deadline loses the "simple, yet undoubted, advantage of being declared official." *Dixon*, 878 F.2d at 781. Consequently, these candidates may well have difficulty raising money and communicating their message to like-minded voters.

The "magnitude" of the burden, however, is small indeed, for candidates can avoid their unofficial fate simply by filing the form sometime during the first six months of election year. Its requirements are simple and well publicized. Materials in the candidate's package mention the disclosure form and the deadline for filing it.

The form requires at most a few hours of accounting for various investments and sources of income.

In comparison to this insignificant burden, courts have routinely upheld petition requirements that require potential candidates to gather hundreds of signatures by a certain deadline before they can be placed on the ballot. For example, in *Libertarian Party of Virginia v. Davis*, 766 F.2d 865 (4th Cir.1985), the Fourth Circuit upheld Va.Code § 24.1–159, which requires political organizations other than parties who wish to be listed on the ballot to gather at least 200 signatures from each congressional district in Virginia and that each signature be witnessed by another registered voter from the same district as the signer. The Court held that the statute's requirement of "only a nominal demonstration of support" passed constitutional muster. In contrast, the simple filing of a form by a certain date can hardly be said to infringe associational rights.

Nor can the plaintiffs demonstrate that § 24.1–167 "limits political participation by an identifiable political group." *Anderson*, 460 U.S. at 793, 103 S.Ct. at 1572. The statute applies regardless of a candidate's party affiliation, and El–Amin does not allege that the burden falls more heavily on poorer or minority candidates. The plaintiffs do argue that the statute gives preferential treatment to incumbents. This charge, if well grounded, would require strict scrutiny of the statute, for "[f]ew prospects are so antithetical to the notion of rule by the people as that of a temporary majority entrenching itself by cleverly manipulating the system through which voters, in theory, can register their dissatisfaction by choosing new leadership." Tribe, § 13–18.

But § 24.1–167 does not give any preference to incumbents. In fact, Virginia statutes require incumbents to file the financial disclosure form five months *earlier* than new candidates. Failure to file by January 15 technically constitutes malfeasance for which an incumbent could be removed from office. *See* Va.Code § 2.1–639.19. Though as a realistic matter

this drastic action seems unlikely, even if the statute prescribed no penalty at all for missing the January deadline, incumbents would still be subject to the same strict deadline as new candidates in June, and would be no more entitled to an extension than was El–Amin. Furthermore, new candidates are permitted to file the statement at any time from January 1 of election year through June 16, just as incumbents are. The Court can discern no favoritism for incumbents, who would no doubt cry foul if the statute required them to file by January 15 without extension or required them to file a second statement in June. Applying the tests of either equal protection or the first amendment, this statute simply does not favor incumbents.

Virginia's legitimate, nondiscriminatory requirement that a candidate comply with a fixed deadline that it publicizes to all candidates falls well within the bounds of those legitimate administrative regulations that states must impose if elections are to be conducted fairly and efficiently. No voter could complain that his or her right to vote was compromised if he or she forgot to vote on the right Tuesday in November; El–Amin's claim amounts to no more than that.

## V

Because the statute does not appreciably burden the plaintiffs' rights, their claim fails the first prong of the *Anderson* test and the Court need not evaluate the state's asserted interests. Even if the burden on the plaintiffs were greater, the state's interests in the disclosure requirement and the fixed deadline weigh heavily in the balance. The plaintiffs do not challenge the state's interest in collecting financial information on candidates and holding it for public review, to ensure that an informed electorate can judge a candidate's possible biases. Amended Complaint ¶ 31; *see, e.g., Plante v. Gonzalez*, 575 F.2d 1119, 1134–37 (5th Cir.1978). Rather, they argue that the state has no interest in collecting the information as early as it does nor in strict adherence to a particular deadline. In fact, they claim that the latter practice is "capricious and arbitrary state action."

Amended Complaint ¶ 39. They point out that the Board of Elections does not use the information in the form for any purpose (except making it available to the public), and that because the ballots are not printed until September there is no need to determine official candidates by mid-June.

The plaintiffs somewhat underestimate the time needed to prepare for November elections even after the Board has determined the slate of official candidates. As reviewed in defendant Fitz–Hugh's affidavit, the Board needs several months to ensure that all local election ballots throughout the state correctly list each of the 465 candidates and are ready to be distributed. The deadline thus extends beyond the need for the financial information; more generally, the state has an interest (though perhaps not a compelling one) in determining the field of official candidates early so that voters may begin considering and debating their relative qualifications.

The state could avoid these problems, of course, by requiring the statement to be filed but not making it a prerequisite to official status. But the state's important interest in informing the electorate would justify the requirement that the statements be available to the public throughout the campaign. *See, e.g., Eu v. San Francisco Democratic Central Comm.*, 489 U.S. ——, ——, 109 S.Ct. 1013, ——, 103 L.Ed.2d 271, 285 (1989); *Anderson*, 460 U.S. at 796, 103 S.Ct. at 1574. The deadline guarantees that voters have early access to important information about how candidates will conduct themselves in office, information that may not otherwise be available and will often be worthy of public debate. An earlier deadline is also more important for local elections, which normally receive much less publicity than statewide or national elections. *Cf. Anderson*, 460 U.S. at 798, 103 S.Ct. at 1575.

The plaintiffs' claim that a fixed deadline is "capricious and arbitrary" fails on its face. The system before the 1988 amendment lent itself to much more abuse, favoritism and caprice. The old statute gave the Board of Elections unfettered discretion to

grant or withhold extensions, potentially permitting Board of Elections staff (largely political appointees) to permit late entries by favored candidates. The new statute provides a bright-line, fixed rule that applies equally to all candidates and cannot be manipulated.

A more benign regulation cannot be imagined. The statute evenhandedly imposes a simple requirement on all potential candidates that furthers legitimate state interests. Balancing the interests, the Court concludes that the statute places an insignificant burden on candidacy that is unlikely to pose any serious barrier to reasonably diligent candidates, and therefore does not appreciably restrict voters' choices. At the same time it promotes an informed electorate without the potential for corruption inherent in the old statute, and therefore the voters' interests are better furthered with the statute than without it. The Constitution does not protect candidates from their own carelessness.

## VI

■ Finally, El-Amin also argues that by meeting the residency and other requirements to be a candidate for Richmond Commonwealth's Attorney, he somehow gained a property interest in candidacy that the Board of Elections has taken without due process of law. Property interests, of course, are created not by the Constitution but by some independent guarantee, primarily state law; the Constitution only mandates that certain procedures be followed when state-created property interests are taken. *See, e.g., Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Kersey v. Shipley,* 673 F.2d 730, 732 (4th Cir.1982).

In this case, if the state has created any "entitlement to candidacy" for state offices at all, a doubtful proposition at best, that interest certainly arises only when a potential candidate has completed all of the administrative requirements that go along with candidacy. Even if such a right exists generally, El-Amin gained no entitlement because he did not satisfy the state's restrictions, which serve as a condition precedent to any property interest that may exist. The Board of Elections therefore did not deprive El-Amin of any property.

For these reasons, the defendants' motion is GRANTED as a motion for summary judgment and the case is DISMISSED.