John Kenneth "Ken" JOHNSON
and Gary Jolly, Plaintiffs,

v.

ADMINISTRATIVE OFFICE OF THE
COURTS, Commonwealth of
KENTUCKY, Defendant.

Civil Action No. 00–19.

United States District Court,
E.D. Kentucky,
at Covington.

Feb. 21, 2001.

Robert E. Blau, Jolly & Blau, PSC, Cold Spring, KY, for plaintiff.

William B. Pettus, Office of the Attorney General, Frankfort, KY, for defendant.

## OPINION & ORDER

BERTELSMAN, District Judge.

### INTRODUCTION

Since at least 1890, candidates for the office of Circuit Court Clerk in Kentucky have been required to pass an examination of some type to be eligible for the office. Section 100 of the 1890 Kentucky Constitution reads:

> No person shall be eligible to the office of Clerk unless he shall have procured from a Judge of the Court of Appeals, or a Judge of a Circuit Court, a certificate that he has been examined by the Clerk of his Court under his supervision, and that he is qualified for the office for which he is a candidate.

Pursuant to this authority, the Supreme Court of Kentucky in 1985 undertook to regularize the manner in which these examinations are administered. At that time, the Supreme Court adopted SCR 1.060(2):

> No such certificate shall be issued to any person unless that person has received a passing grade of 70% or more on a standardized examination to be prepared and administered by the Administrative Office of the Courts. The examination shall include questions pertaining to the materials included in the Circuit Clerk's Manual, Circuit Clerk's Accounting Manual, and the Personnel Policies of the Court of Justice.

The examination requirement was challenged in the Kentucky courts but upheld in *Combs v. Huff,* 858 S.W.2d 160 (Ky. 1993) (equal protection raised, as well as certain state law grounds).[1]

## THE INSTANT LITIGATION

### Facts

For the election to be held in the year 2000, the Kentucky Administrative Office of the Courts (AOC) contracted with Professor Paul Weber of the University of Louisville to administer the test at issue on the campus of the university. For reasons that are not entirely clear, an unusual number of aspirants to the office of circuit clerk failed the test. In fact, only 42 percent passed, although previous pass rates had been around 70 percent. Several of those failing are or were Plaintiffs in this federal action. So was a voter who desired to vote for one of the unsuccessful examinees.[2] Plaintiffs allege that the pass rate was so low because of internal problems with the test, how it was administered, and the questions asked. Plaintiffs argue that questions concerning forms used by circuit clerks were irrelevant. For example, plaintiffs cite the following question:

What form is required before a petition for dissolution or annulment is filed?

A. AOC Form 025

B. VS 102

C. AOC Form 260

D. VS 300

Another question about which plaintiffs complain is as follows:

Pay of expert witness fees are the responsibility of:

A. Defense Counsel

B. County Attorney

C. Prosecuting Attorney

D. Attorney General

Plaintiffs maintain that every answer could be correct depending upon which attorney hired the expert.

Additionally, there were three errors on the test. One question incorrectly listed two "A's" for the answer. Also, there were two questions numbered as "23" causing confusion in marking the appropriate items on the separate answer sheet.

Furthermore, plaintiffs complain that there were 50 questions on reading comprehension; 25 questions on mathematics computation; 50 questions on applied mathematics; and 55 questions on language. Also, the applicants were given a 20-question spelling test.

Based on the foregoing, plaintiffs maintain that the test was not reviewed for quality and fairness prior to its administration and that questions were asked which had little or nothing to do with one's ability to serve as circuit clerk.

To support this contention, plaintiffs assert that a 20-year deputy clerk failed the test, whereas a newcomer with no experience passed the test.

Both parties have now moved this court for summary judgment.

## PLAINTIFFS' CONTENTIONS[3]

Although plaintiffs' arguments are somewhat unclear, they apparently contend that

---

1. The court held that under the unified Kentucky court article to the Kentucky Constitution adopted in 1975, it was appropriate to implement the 1890 examination requirement in the manner provided in SCR 1.060.

2. Plaintiffs include one voter, Gary Jolly, who alleges that his constitutional rights were infringed because he was unable to vote for plaintiff, Ken Johnson. Plaintiff, Ken Johnson, took the January 15th examination, and he was originally told that he had failed the

test. However, later his test was rescored, and it was determined that he passed the test. His name appeared on the May 2000 primary ballot.

3. This court held that the case was not moot even though plaintiff Johnson's exam was regraded so that he passed the test. This is because the situation is one that is capable of repetition yet evading review, should Johnson decide to be a candidate for Circuit Clerk in 2004. *Chandler v. Miller*, 520 U.S. 305, 117

the imposition of the test, at least as administered in 2000, is an undue burden on the electoral process, thus violating their rights to freedom of association, equal protection, and substantive due process as guaranteed by the Constitution of the United States and freedom from the exercise of arbitrary power as guaranteed by Section 2 of the Kentucky Constitution. Plaintiffs further contend that such alleged violations result in a cause of action under 42 U.S.C. § 1983.

## ANALYSIS

### Standard of Review

The standard for review in this case has been established by the Supreme Court of the United States in *Burdick v. Takushi*, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992).[4]

 *Burdick* establishes the following principles which are controlling herein:

1. Voting and candidacy rights are of "the most fundamental significance under our constitutional structure." 112 S.Ct. at 2063; *see also, League of Women Voters v. Diamond,* 965 F.Supp. 96 (D.Me.1997).

2. These rights are, however, "not absolute." *Burdick,* 112 S.Ct. at 2063.

3. States retain the power to regulate their own elections. Indeed it is to be expected that there will be substantial regulation of elections if they are not to be embroiled in chaos. *Id.*

4. All election laws will have some restrictive effect on citizens' and candidates' rights. *Id.*

5. Therefore, not every voting regulation will be subject to "strict scrutiny" (requiring that the regulation be narrowly tailored to further a compelling state interest). *Id.*

6. The fact that a state election regulation, such as the one now before this court, tends to "limit the field of candidates from which voters might choose ... does not in and of itself compel strict scrutiny." *Id.*

7. Instead a more flexible standard applies. *Id.*

8. A court considering a challenge to state election law "must weigh the character and magnitude of the asserted injury [to free speech and association rights] ... against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.*[5]

9. The rigorousness of the inquiry into the propriety of the challenged state rule depends upon the extent to which that rule burdens First and Fourteenth Amendment rights. *Id.*

10. If those rights are subjected to severe restrictions, the rule must be narrowly drawn to advance a state interest of compelling importance. *Id.*

11. On the other hand, if the rule "imposes only reasonable nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests" are probably sufficient to justify the Rule. Thus, nondiscriminatory restriction subjects the law to the less rigorous *Anderson* balancing test, i.e. a "rational basis" review. *Id.*[6]

---

S.Ct. 1295, 137 L.Ed.2d 513 (1997). This court also denied a motion for temporary restraining order on the grounds that there was a lack of probability of success.

**4.** The *Burdick* court in turn relies heavily on *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983).

**5.** Quoting *Anderson,* 103 S.Ct. at 1570. Internal quotation marks omitted here.

**6.** This test has been applied by the United States Court of Appeals for the Sixth Circuit in several cases. *See, e.g., Corrigan v. City of Newaygo,* 55 F.3d 1211 (6th Cir.1995); *Rosen v. Brown,* 970 F.2d 169 (6th Cir.1992).

**540**

## The Standard Applied

Following the above guidelines, this court must first determine whether the examination requirement impairs plaintiffs' First and Fourteenth Amendment rights so severely that strict scrutiny is required.

Plaintiffs, of course, argue it does. In their argument, they blur the problems experienced with the grading of the 2000 examination with the general validity of an examination requirement for candidacy for the office of circuit clerk and the nature of the material covered in the examination. These topics must be considered separately, however.

### *The Examination Requirement*

■ The court sees nothing unduly burdensome about the examination requirement per se. It is non-discriminatory with regard to gender, race, and/or political affiliation. Incumbent circuit clerks are exempt from having to take the test once in office, but this is not unreasonable.[7] Eventually, all incumbents will have taken the exam.

Although the examination prerequisite is burdensome to some extent, under *Burdick* some restrictions are permitted if justified by legitimate state interests. Kentucky has a strong interest in assuring that only qualified persons hold this important office. The circuit clerk acts as administrator for the county court of general jurisdiction, the circuit court. He or she also administers the court of limited jurisdiction, the county district court, which has jurisdiction over lesser civil cases, minor criminal cases, and juvenile and probate jurisdiction.

Since 1976, when the city police courts were abolished, all misdemeanor cases throughout the county have been heard in the district court.[8]

The circuit clerk also has other non-court-related duties: such as accounting for substantial sums of money, supervising large staffs of deputy clerks, and issuing drivers' and boat licenses. *Combs*, 858 S.W.2d at 162–63.

Therefore, the state has a strong interest in assuring that this office runs efficiently. Indeed, this interest has been recognized in the state constitution, as pointed out above. Because the circuit clerk employs a large staff, the position is attractive to local politicians, and the circuit clerk is often a political power-broker in the county.

The state has a strong interest in assuring that a person with aspirations to hold this office is prepared to administer its complexities. If the office is not run properly, court records, including certain probate records and family law records, could become chaotic to the great detriment of the public. Substantial delays and confusion in the administration of justice might also ensue.[9]

A written examination is a rationally-based, non-political,[10] and non-discriminatory way of assuring that only qualified persons hold this important office.

Therefore, the mere requirement of a written examination does not justify the imposition of strict scrutiny according to the Supreme Court guidelines outlined above.

### *The Content of the Examination*

Plaintiffs impugn the content of the examination as being too nit-picking in that it

---

7. *Combs v. Huff,* 858 S.W.2d 160 (Ky.1993) (exempting circuit clerks from SCR 1.060 does not violate the equal protection clause.); *see also El–Amin v. State Bd. of Elections* 717 F.Supp. 1138 (E.D.Va.1989)

8. Ky. Const. § 113.

9. The defendant argues that inefficiency in the circuit clerk's office might also expose the Commonwealth to liability; this is somewhat problematic but also a valid consideration.

10. This is true so long as the tests are impartially graded, which the delegation of the examining function to the University of Louisville was apparently designed to assure.

delves into the examinee's knowledge of minutia of the circuit clerk's administrative manual, including knowledge of form numbers and arcane procedures.[11] This is hardly surprising in that SCR 1.060(2) provides: "The examination shall include questions pertaining to the materials included in the Circuit Clerk's Manual, the Circuit Clerk's Accounting Manual, and the Personnel Policies of the Court of Justice."

This argument might have some merit if the examinees had not been forewarned that they would be examined on such material and given the appropriate manuals to study.

█ As it is, it seems rational to include in the examination for a position as head of a department of local government—the main function of which is dealing in technicalities—questions testing the ability to learn and comprehend such technicalities. The circuit clerk's examination is hardly more detailed than that required to obtain a driver's license.

Plaintiffs also attack the inclusion in the examination of questions concerning general knowledge. These include questions concerning reading and mathematics from a sixth to eighth-grade level. Plaintiffs find particularly reprehensible that the answer to one question required the exam-taker to recognize the characteristics of a parallelogram.

Plaintiffs are jerking the wrong chain in making such arguments to this court. This writer is on record as deploring the decline, which exists even among attorneys, of the ability to write the English language correctly.[12]

Certainly, the circuit clerk must be able to write an intelligible letter or more formal documents that will not bring the office into grammatical disrepute. There also might be a remodeling or construction project where geometrical knowledge including the ability to recognize a parallelogram would be required.[13]

Examinations such as this one are not at all unusual. The circuit clerk's exam is no more difficult than the SAT required for college admission. Similar tests are even given as an admission requirement to some high schools. Standardized examinations with similar requirements are being increasingly required for advancement or graduation in grade and high schools. *See e.g., Performance on Ninth–Grade Proficiency Tests Continues to Improve*, ODE News Release (Jan. 16, 2001), *available at* http://www.ode.state.oh.us/.

### Problems with the 2000 Examination

Defendants admit that there were several particularized problems with the year 2000 examination that caused some applicants to fail. Examples of these difficulties were misnumbering and omission of questions causing examinees to get their answer sheets out of synch with the questions.

As far as this case is concerned, plaintiff Johnson's examination was re-graded so that any reduction in his score resulting from these errors was corrected. His name appeared on the primary ballot in Campbell County.

█ There is no proof that these anomalies in the administration were the result of a conspiracy or of invidious intent on the part of anyone. Therefore, the court must assume that these difficulties will be avoided the next time the examination is administered. The court, therefore, concludes that the existence of such errors in

11. Examples of such questions may be found in the statement of facts, *supra*.

12. *See* Wm. Bertelsman, *Views from the Federal Bench: Against the Spellchecker*, 59 Ky. Bar Journal 48 (1995); *Views from the Federal Bench: Against the Spellchecker II*, 60 Ky. Bar Journal 41 (1996); *Views from the Federal*

Bench: Against the Spellchecker III, 62 Ky. Bar Journal 48 (1998).

13. In the opinion of the court, plaintiffs' scorn for this useful geometrical figure is uncalled for.

one year's examination is not such a burden as to invoke strict scrutiny.

## CONCLUSION

For the above reasons the court concludes that the examination required for aspirants to the office of circuit clerk, as mandated by SCR 1.060 by the Kentucky Supreme Court, "imposes only reasonable nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters" and, therefore, that "the State's important regulatory interests" are "sufficient to justify the rule." [14] *Burdick, supra.*

In the absence of a constitutional violation, plaintiffs' cause of action under 42 U.S.C. § 1983 cannot survive.

Thus, the motion for summary judgment of the plaintiffs. **(doc. # 58–1)** must be **denied** and that of the defendants **granted (doc. # 56–1).**

Plaintiffs' claims arising under the Kentucky Constitution [15] are hereby **dismissed without prejudice** as the court declines to exercise supplemental jurisdiction over such pursuant to 28 U.S.C. 1367(c)(3).

A separate judgment will enter dismissing the complaint and striking this matter from this court's docket.

## *JUDGMENT*

Pursuant to the Order and Opinion entered concurrently herewith, and the court being advised,

**IT IS ADJUDGED** that this action be, and it is, hereby **dismissed** and **stricken** from the docket of this court.

---

14. In reaching this conclusion, the court has considered the impact of the restrictions both separately and collectively.

15. In plaintiffs' complaint, they allege causes of action under Section 2 of the Kentucky Constitution for deprivation of liberty and property without due process of law and equal protection violations. Plaintiffs also allege that their rights to free speech and political freedom under Section 1 of the Kentucky Constitution have been violated.