**Neil SIEGEL, Georgette Sosa Douglas, Gonzalo Dorta, Carretta King Butler, Dalton Bray, James S. Higgins, and Roger D. Coverly, as Florida registered voters,**

**and**

**Governor George W. Bush, and Dick Cheney, as candidates for President and Vice President of the United States of America, Plaintiffs,**

**v.**

**Theresa LEPORE, Charles E. Burton, Carol Roberts, Jane Carroll, Suzanne Gunzburger, Robert Lee, David Leahy, Lawrence King Jr., Miriam Lehr, Michael McDermott, Deanie Lowe, and Jim Ward, in their official capacities as members of the County Canvassing Boards of Palm Beach, Miami–Dade, Broward, and Volusia Counties, respectively, Defendants.**

No. 00–9009–CIV.

United States District Court,
S.D. Florida.

Nov. 13, 2000.

Marcos Daniel Jimenez–D'Clouet, White & Case, Miami, FL, for plaintiffs.

Bruce S. Rogow, Fort Lauderdale, FL, for Theresa LePore.

Andrew James McMahon, Palm Beach County Attorney's Office, West Palm Beach, FL, for Charles E. Burton, Carol A. Roberts.

Norman M. Ostrau, Broward County Attorney's Office, Fort Lauderdale, FL, for Jane Carroll, Suzanne Gunzburger, Robert F. Lee.

Lee Allen Kraftchick, Dade County Attorney's Office, Miami, FL, for David Leahy, Lawrence King, Jr., Miriam Lehr.

David Victor Kornreich, Muller Mintz Kornreich Caldwell, Casey Crosland & Bramnick, Miami, FL, Daniel D. Eckert, L. Roland Blossom, Frank B. Gummey, III, Volusia County Attorney's Office, De-

Land, FL, for Michael McDermott, Ann McFall, Pat Northy.

## ORDER ON PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

MIDDLEBROOKS, District Judge.

THIS CAUSE comes before the Court upon Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction, filed November 11, 2000.

### I. Introduction

Plaintiffs, consisting of individual registered Florida voters as well as the Republican candidates for President and Vice–President Governor George W. Bush and Richard Cheney, move for entry of a temporary restraining order and preliminary injunction against Defendants, individual members of the electoral canvassing boards of Palm Beach, Broward, Miami–Dade, and Volusia Counties. They request that the canvassing boards of Broward, Miami–Dade, Palm Beach, and Volusia Counties be enjoined from proceeding with manual recounts of the November 7th election.

The gravamen of their complaint is that a manual recount may diminish the accuracy of a vote count because of ballot degradation and the exercise of discretion on the part of the county canvassing boards in determining a voter's intent. Implicit in their argument is a concern that selected manual recounts in some counties but not others may skew the election results even if the hand count is accurate. This is so because the machine counting process may reject ballots which upon visual inspection can be determined to be valid, and the machine error rate is likely to be spread equally across all precincts. If only selected precincts or counties are manually counted, the hand count, assuming it is more accurate, may help the candidate favored in those areas.

These are serious arguments. The question becomes who should consider them. Under the Constitution of the United States, the responsibility for selection of electors for the office of President rests primarily with the people of Florida, its election officials and, if necessary, its courts. The procedures employed by Florida appear to be neutral and, while not yet complete, the process seems to be unfolding as it has on other occasions. For the reasons that follow, I believe that intervention by a federal district court, particularly on a preliminary basis, is inappropriate.

### II. Factual Background

On November 7, 2000, the United States held a general election wherein Florida voters cast ballots for several offices, including votes for the twenty-five electors for President and Vice President of the United States. On November 8, 2000, the Division of Elections for the State of Florida reported that the Republican Party presidential ticket received 2,909,135 votes and the Democratic Party presidential ticket received 2,907,351 votes. Other candidates on the presidential ballot received a total of 139.616 votes. The margin of difference between the votes received by the Republic and Democratic presidential tickets was 1,784, or 0.0299% of the total Florida vote.

In Florida, the administration of elections includes statewide and local features. While the Secretary of State is the chief election officer of the state, *see* Fla.Stat. § 97.102(1), the actual conduct of elections occurs in Florida counties. Except for the appointed supervisor in Miami–Dade County, the county supervisor of elections is an elective office, chosen every four years. *See* Fla. Stat. § 98.015(1). The supervisor employs deputy supervisors. *See* Fla. Stat. § 98.015(8). The county canvassing board is an essential part of Florida's election scheme. Ordinarily, the board is made up of the supervisor of elections, a county court Judge, and the chair of the board of county commissioners. *See* Fla. Stat. § 102.131(1). The can-

vassing boards are responsible for counting the votes given each candidate. *See* Fla. Stat. § 102.141(2). It is their responsibility to judge the accuracy of vote counts. In addition, a county canvassing board, on its own initiative, may order mechanical recounts "[i]f there is a discrepancy which could affect the outcome of an election." Fla. Stat. § 102.166(3)(c). After the vote counts are certified, the results are forwarded to the Department of State for any election involving a federal or state officer. See Fla. Stat. § 102.111(1); Fla. Stat. § 102.112. Based on the sum total of the results generated locally, the Elections Canvassing Commission, consisting of the Governor, the Secretary of State, and the Director of the Division of Elections, is granted authority to "certify the returns of the election and determine and declare who has been elected for each office." Fla. Stat. § 102.111(1). The Commission also issues certificates of the result of the election for federal and state officers, including presidential electors. See Fla. Stat. § 102.121. County canvassing boards are obligated to file a report with the Division of Elections at the same time the results of an election are certified. See Fla. Stat. § 102.141(6). Using these reports, the Secretary of State may issue advisory opinions. *See id.; see also* Fla. Admin. Code 1 S–2.010.

Candidates or voters can promptly protest "erroneous" returns. *See* Fla. Stat. § 102.166(1)-(2). Candidates and political parties also can request manual recounts. *See* Fla. Stat. § 102.166(4). The procedures for such manual recounts are described in the pertinent statutory provisions. *See* Fla. Stat. § 102.166(4)-(10). Following certification by the county canvassing board, a candidate or voter also may contest election results by filing a complaint in circuit court. *See* Fla. Stat. § 102.168 *et seq.* The circuit courts are authorized to provide any relief that is appropriate. *See* Fla. Stat. § 102.168(8). District courts of appeal and the Florida Supreme Court are available to review circuit court orders.

In this case. the initial phase of election verification began automatically because Florida Statutes, § 102.141(4), compels machine recount for electoral differentials of 0.5% or less. The law further provides that candidates, as well as political parties, can submit written requests for hand counts. If granted, the threshold hand count encompasses a minimum of three precincts or 1% of the count's vote, whichever is greater. If the results of the initial manual recount indicate a disparity with the machine count which could affect the outcome of the election, the canvassing board "shall" undertake a manual recount of all precincts. *See* Fla. Stat. § 102.166(5).

In this case, the Florida Democratic Party filed requests for manual recounts in Broward, Miami–Dade, Palm Beach, and Volusia Counties within seventy-two hours as required by Florida Statutes, § 102.166(4)(b). As required by the statute; those requests set forth reasons, which included the extraordinary closeness of the statewide margin, as well as concern as to whether the vote totals reliably reflected the true will of the Florida voters.

### Broward County

On November 8, 2000, pursuant to Fla. Stat. § 102.141(4), the Broward Canvassing Board conducted a statutorily mandated machine recount which is now complete. As a result of that recount, Vice President Gore received an additional 43 votes and Governor Bush received an additional 44 votes. On November 9, 2000, within 72 hours after midnight on the date the election was held, the Broward County Democratic Party filed a request for a manual recount pursuant to Florida Statutes, § 102.166(4). Pursuant thereto, a meeting of the Broward Canvassing Board was scheduled for Friday, November 10, 2000, at 10:00 a.m. The Broward County Republican Party, through its chair, Ed Pozzuoli, was notified by telephone of the date and time of the meeting. The Broward County

Republican Party appeared and participated at the hearing.

The Broward Canvassing Board authorized a manual recount in three of Broward County's precincts, comprising at least one percent of the total votes cast for Vice President Gore. Pursuant to Florida Statutes, § 102.166(4)(d), the Broward County Democratic Party chose the three precincts subject to the manual recount. The one percent recount has not been completed and will continue Monday, November 13, 2000.

### Miami–Dade

The Canvassing Board received a request from the Miami–Dade Democratic Party on November 9, 2000 pursuant to Florida Statutes, § 102.166(4), to conduct a recount. That request was revoked and amended later the same day. The Republican Party of Dade County submitted a response opposing the request for a manual recount. The Canvassing Board has not yet decided whether to grant or deny the request for a recount and has scheduled a hearing for Tuesday, November 14, 2000, at 9:30 a.m. to consider the matter.

### Palm Beach

On November 11, 2000, when the manual recount of one percent of Palm Beach voters established a net gain of nineteen votes for Vice President Gore, the Palm Beach Canvassing Board, by a 2–1 vote, directed a manual recount of all precincts in the county. That decision adhered to Florida Statutes, § 102.166(5)(c), requiring a full recount when the one percent result shows that the election outcome could be changed by a fall manual recount.

Plaintiffs allege that the manual recount in Palm Beach County has been characterized by *ad hoc* and arbitrary decisions. They claim that Leon St. John, attorney for the Palm Beach Canvassing Board, and Bob Nichols, spokesperson for the Board, gave a confusing press briefing on November 11, 2000 in which, at different times, they stated varying standards the Board was using to determine if a ballot would be tallied or not.[1] Plaintiffs also allege that during the first hour of the manual recount no procedural guidance was given to recount observers or party representatives, and that no written criteria or rules were ever promulgated by the Board. Finally, Plaintiffs allege that because there were not enough Republican employees in the Supervisor of Elections' office, certain teams of reviewers did not include any Republican members.

### Volusia

The Canvassing Board was advised during the evening of November 7, 2000 that a malfunction of the diskette in the electronic ballot tabulating machine in precinct 216 caused an obviously erroneous *report* of the results in the presidential vote from that precinct. The supervisor supplied another diskette which was inserted in another electronic ballot tabulating machine and all paper ballots from that precinct were tabulated.

On November 8, 2000, Deanie Lowe, Supervisor of Elections for Volusia County, provided to the Canvassing Board the directive of the Florida Secretary of State to conduct a mandatory recount of the presidential election pursuant to Florida Statutes, § 102.141(4). On November 8, 2000, the Canvassing Board conducted the mandatory recount by reconciling the printouts of all votes case from each electronic ballot tabulating machine with the compilation of results from the host computer. The mandatory recount revealed no variance from the original count. The ballots were not removed from their sealed containers or recounted electronically or manually, except for ballots from precinct 216. Representatives of the Florida Republican Party suggested and expressly

---

**1.** Apparently, the two men referred to different standards for adjudging partially-punched ballots ranging from a "light" test, which counts ballots as vote if light is seen to shine through a punch hole, to a "corner" test, which determines if a corner of a punch hole has been detached.

agreed to a manual recount of precinct 216. The Canvassing Board conducted a manual recount of the ballots from precinct 216 and the result was identical to the result from the electronic tabulation received after the substitution of the diskette.

After the mandatory recount, on November 9, 2000, the Florida Democratic Party requested a manual recount of all ballots. The Canvassing Board granted the request. On November 12, 2000, the Canvassing Board began the manual visual recount of all ballots. Numerous teams of two county employees, who are registered electors, are reading and counting the ballots. Republic and Democratic parties have been afforded the opportunity to have one observer for each counting team. Security of ballot storage and the counting room is provided under the direction of the Canvassing Board with Florida Department of Law Enforcement and Volusia County Sheriffs Office personnel.

The Volusia Canvassing Board has adopted a motion stating that it will comply with the requirements of Florida Statutes, § 102.111, to certify the results of the election to the Department of State no later than 5:00 p.m. on Tuesday, November 14, 2000, unless the time is extended by lawful authority. The Canvassing Board also has authorized the County Attorney and such other attorneys as he may appoint to seek state or federal judicial relief from the time limit for certification provided in Florida Statutes, § 102.111.

### III. Standard for Injunctive Relief

In reviewing Plaintiffs' request for injunctive relief,[2] we apply the traditional four-factor test which requires Plaintiffs to demonstrate: "(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir. 1998) (citing *All Care Nursing Serv. Inc. v. Bethesda Memorial Hosp.,* 887 F.2d 1535, 1537 (11th Cir.1989)). Under our caselaw, "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the 'burden of persuasion' as to the four requisites." *Id.* "The burden of persuasion in all of the four requirements is at all times upon the plaintiff." *Snook v. Trust Co. of Georgia Bank of Savannah, N.A.,* 909 F.2d 480, 483 (11th Cir.1990) (citations omitted). With this standard in mind, we evaluate Plaintiffs' motion.

### IV. Analysis

Our review of Plaintiffs' claims necessarily begins with the United States Constitution. The Constitution does not

2. In this case, Plaintiffs moved for both a preliminary injunction and a temporary restraining order. Federal Rule of Civil Procedure 65(a) permits federal district courts to issue a preliminary injunction only after proper notice has been given to the adverse party. *See* id. Federal Rule of Civil Procedure 65(b), however, permits federal district courts to issue a temporary restraining order ("TRO") "without written or oral notice to the adverse party or his attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting his claim that notice should not be required." Id. If a TRO is granted without notice,"the motion for a preliminary injunction shall be set down for hearing at the earliest possible time." Id. Here, I have set the hearing for the preliminary injunction motion at the earliest possible time that would permit Defendants a fair opportunity to respond to Plaintiff's motion. In my judgment, Plaintiff's motion and accompanying affidavits did not establish that they would suffer "immediate and irreparable injury, loss, or damage" if this Court refrained from entering injunctive relief until a hearing on the motion could be heard first-thing Monday morning.

provide for the popular election of a President or Vice President of the United States on either a national or a state-by-state basis. Instead, the Constitution delineates that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors ... to choose a President and Vice President." U.S. Const., Art. II, § 1. This constitutional provision grants "extensive power to the States to pass laws regulating the selection of electors." *Williams v. Rhodes*, 393 U.S. 23, 30–31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *see also McPherson v. Baker*, 146 U.S. 1, 27, 13 S.Ct. 3, 36 L.Ed. 869 (1892) (noting that the Constitution "recognizes that the people act through their representatives in the legislature, and leaves it to the legislature exclusively to define the method of effecting the object [of selecting electors] )"; *Fitzgerald v. Green*, 134 U.S. 377, 379–80, 10 S.Ct. 586, 33 L.Ed. 951 (1890). (observing that rather than "interfere with the manner of appointing electors, or, where [according to the now general usage] the mode of appointment prescribed by the law of the state is election by the people, to regulate the conduct of such election ...," Congress "has left these matters to the control of the states").[3] However, while this power is broad, "these granted powers are always subject to the limitation that they may not be exercised in a way that violates other specific provisions of the Constitution." *Id.*

■ Here, Plaintiffs assert that Florida Statutes, § 102.166(4) violates the First and Fourteenth Amendments. In adjudi-

cating similar challenges to state electoral laws, the Supreme Court has adopted a balancing test which weighs "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments" versus the legitimacy, strength, and necessity of the state interests underlying the electoral scheme. *Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (citing *Williams*, 393 U.S. at 30–31, 89 S.Ct. 5, 21 L.Ed.2d 24). More recently, the Court has observed:

> Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' *Norman v. Reed*, 502 U.S. 279, 289, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992). But when a state election law provision imposes only reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions. *Anderson*, 460 U.S. at 788, 103 S.Ct. at 1569–1570; *see also* id., at 788–789. n. 9, 103 S.Ct. at 1569–1570, n. 9.

*Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 2063–64, 119 L.Ed.2d 245 (1992).[4] A central precept of this ap-

---

**3.** In addition, federal law gives states the exclusive power to resolve controversies over the manner in which presidential electors are selected:

> If any State shall have provided, by laws enacted prior to the day fixed for the appointment of the electors, for its final determination of any controversy or contest concerning the appointment of all or any of the electors of such State, by judicial or other methods or procedures, and such determination shall have been made at least six days before the time fixed for the meeting of the electors, such determination made

pursuant to such law so existing on said day, and made at least six days prior to said time of meeting of the electors, shall be conclusive, and shall govern in the counting of the electoral votes as provided in the Constitution, and as hereinafter regulated, so far as the ascertainment of the electors appointed by such State is concerned.

3 U.S.C. § 5 (2000).

**4.** The Eleventh Circuit has explained in *Fulani v. Krivanek*, 973 F.2d 1539, 1543 (11th Cir.1992), that "[t]he approach used by the Anderson Court can be described as a balanc-

proach is the recognition that while "[e]lection laws will invariably impose some burden upon individual voters ... [c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections ... if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Id.* (citations omitted). It is within this framework that we address the specifics of Plaintiffs' claims.[5]

Florida law outlines a structural process by which a candidate or political party "may file a written request with the county canvassing board for a manual recount." Fla. Stat. § 102.166(4)(a). Such a request "must be filed with the canvassing board prior to the time the canvassing board certifies the results for the office being protested or within 72 hours after midnight of the date the election was held, whichever occurs later." Fla. Stat. § 102.166(4)(b). Once a request is made, "[t]he county canvassing board may authorize a manual recount. If a manual recount is authorized, the county canvassing board shall make a reasonable effort to

notify each candidate whose race is being recounted of the time and place of such recount." Fla.Stat. § 102.166(4)(c). If the board decides to conduct a manual recount, "[t]he manual recount must include at least three precincts and at least 1 percent of the total votes cast for such candidate or issue. In the event there are less than three precincts involved in the election, all precincts shall be counted. The person who requested the recount shall choose three precincts to be recounted, and, if other precincts are recounted, the county canvassing board shall select the additional precincts." Fla. Stat. § 102.166(4)(d). "If the manual recount indicates an error in the vote tabulation which could affect the outcome of the election," the statute authorizes the canvassing board to undertake a variety of remedial measures, including the manual recount of all ballots. Fla. Stat. § 102.166(5).[6] The state law also provides that "any manual recount shall be open to the public," and outlines the procedures by which a manual recount must take place. Fla. Stat. § 102.166(6)-(10).[7]

---

ing test that ranges from strict scrutiny to a rational-basis analysis, depending on the circumstances." *Id.* The Eleventh Circuit then emphasized that the Supreme Court in *Burdick* "reiterated the Anderson test and reaffirmed that 'to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest (3)27 would tie the hands of States seeking to assure that elections are operated equitably and efficiently.'" *Id.* (quoting *Burdick*, 504 U.S. at 433, 112 S.Ct. 2059).

5. To the extent Plaintiffs raise an independent equal protection claim in addition to their due process and voting claims, I find for the reasons discussed herein that Plaintiff has failed to establish likelihood of success on this constitutional claim.

6. This provision states, the county canvassing board shall:

(a) Correct the error and recount the remaining precincts with the vote tabulation system;
(b) Request the Department of State to verify the tabulation software; or

(c) Manually recount all ballots.
Id.

7. These procedures are as follows:

(a) The county canvassing board shall appoint as many counting teams of at least two electors as is necessary to manually recount the ballots. A counting team must have, when possible, members of at least two political parties. A candidate involved in the race shall not be a member of the counting team.
(b) If a counting team is unable to determine a voter's intent in casting a ballot, the ballot shall be presented to the county canvassing board for it to determine the voter* s intent.
(8) If the county canvassing board determines the need to verify the tabulation software, the county canvassing board shall request in writing that the Department of State verify the software.
(9) When the Department of State verifies such software, the department shall:
(a) Compare the software used to tabulate the votes with the software filed with the Department of State pursuant to § 101.5607; and

This state election scheme is reasonable and non-discriminatory on its face. Unlike a ballot access restriction that burdens only certain candidates or parties, *see Anderson,* 460 U.S. at 787–89, 103 S.Ct. 1564 (invalidating an early filing deadline for independent presidential candidates); *Williams,* 393 U.S. at 30–31, 89 S.Ct. 5 (striking down state election laws that imposed substantial ballot access restrictions on minority parties), Florida's manual recount provision is a "generally-applicable and evenhanded" electoral scheme designed to "protect the integrity and reliability of the electoral process itself" the type of state electoral law often upheld in federal legal challenges. *Anderson,* 460 U.S. at 788 n. 9, 103 S.Ct. 1564. On its face, the manual recount provision does not limit candidates access to the ballot or interfere with voters' right to associate or vote. Instead, the manual recount provision is intended to safeguard the integrity and reliability of the electoral process by providing a structural means of detecting and correcting clerical or electronic tabulating errors in the counting of election ballots. While discretionary in its application, the provision is not wholly standardless. Rather, the central purpose of the scheme, as evidenced by its plain language, is to remedy "an error in the vote tabulation which could affect the outcome of the election." Fla. Stat. § 102.166(5).[8] In this pursuit, the provision strives to strengthen rather than dilute the right to vote by securing, as near as humanly possible, an accurate and true reflection of the will of the electorate. Notably, the four county canvassing boards challenged in this suit have reported various anomalies in the initial automated count and recount.[9] The state manual recount provision therefore serves important governmental interests.

■ In addition, the manual recount provision is the type of state electoral law that safely resides within the broad ambit of state control over presidential election procedures. As the Eleventh Circuit has explained, " '[t]he functional structure embodied in the Constitution, the nature of the federal court system and the limitations inherent in the concepts both of limited federal jurisdiction and of the remedy afforded by § 1983' operate to restrict federal relief in the state election context." *Curry v. Baker,* 802 F.2d 1302,1314 (11th Cir.1986) (quoting *Gamza v. Aguirre,* 619 F.2d 449, 452 (5th Cir.1980)); *see also Duncan v. Poythress,* 657 F.2d 691 (5th Cir. Unit B 1981). In *Curry,* the Eleventh Circuit rejected a substantive due process claim based on an Alabama subcommittee's use of polling data to determine the number of illegal votes cast in a Democratic gubernatorial runoff primary. The Court noted "[a]lthough federal courts closely scrutinize state laws whose very design infringes on the rights of voters, federal courts will not intervene to examine the validity of individual ballots or supervise the administrative details of a local election. Only in extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation."

---

(b) Check the election parameters.
(10) The Department of State shall respond to the county canvassing board within 3 working days.
*Id.*

8. In addition, as previously outlined, once a decision to conduct a manual recount is made by the canvassing board, the Florida manual recount law articulates a structured process for conducting the recount.

9. One of the main rationales behind a manual recount system is observe whether an imprecise perforation, called a "hanging chad," exists on the physical ballot. If the blunt-tipped voting stylus strikes the ballot imperfectly, the chad, the rectangular perforation designed to be removed from a punch card when punched, can remain appended to the ballot (although it is pushed out), and an automated tabulation will record a blank vote. This problem is particularly associated with counties that still rely on punch card technology. Palm Beach, Broward, and Miami–Dade all use punch card voting systems. The final county, Volusia County, found a series of irregularities with its automated tabulation results including reports of computer failure and statistical aberrations.

Id. (citation omitted). Moreover, the Supreme Court, in the analogous context of a state manual recount of a Senate election, stated:

> Unless Congress acts, Art. I, § 4, empowers the States to regulate the conduct of senatorial elections. This Court has recognized the breadth of those powers: 'It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.' Indiana has found, along with many other States, that one procedure necessary to guard against irregularity and error in the tabulation of votes is the availability of a recount. Despite the fact that a certificate of election may be issued to the leading candidate within 30 days after the election, the results are not final if a candidate's option to compel a recount is exercised. *A recount is an integral part of the Indiana electoral process and is within the ambit of the broad powers delegated to the States by Art. I. § 4.*

Roudebush v. Hartke, 405 U.S. 15, 24, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972) (emphasis added).

■ The central thrust of these decisions is that federal courts should tread cautiously in the traditional state province of electoral procedures and tabulations. Simply put, "[f]ederal courts are not the bosses in state election disputes unless extraordinary circumstances affecting the integrity of the state*s election process are clearly present in a high degree. This well-settled principle-that federal courts interfere in state elections as a last resort-is basic to federalism, and we should take it to heart." *Roe v. Evans*, 43 F.3d 574, 585 (11th Cir.1995) (Edmondson, J., dissenting). These principles of comity and federalism equally apply to state electoral procedures for the selection of presidential electors given the broad ambit of state authority in this area as outlined in Article II, Section 1 of the United States Constitution. Otherwise, federal courts run the risk of being "thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law." *Duncan v. Poythress*, 657 F.2d 691. 701 (5th Cir.1981).

■ The thrust of Plaintiffs' position is that Florida's decentralized county-by-county electoral system can yield disparate tabulating results from county to county. For instance, similarly-punched ballots in different counties may be tabulated differently in a manual recount due to the introduction of human subjectivity and error. Further, if manual recounts are held in certain counties but not others, ballots previously discarded by electronic tabulation in manual recount counties would be counted, while similarly-situated ballots in non-manual recount counties would not-thereby diluting the vote in non-manual recount counties.[10] These concerns are

---

10. It should be noted that any presidential candidate was afforded an equal opportunity under the statute to ask for a manual recount in each Florida county. No evidence has been presented to suggest any discriminatory practice or policy in the county-by-county determinations to grant such recount requests. Whatever disparities may result from a county-by-county election count or recount do not constitute a constitutional injury. As the former Fifth Circuit has recognized, in the context of a Fourteenth Amendment challenge to the tabulation of election vote results in a school district election, there is a fundamental " 'distinction between state laws and patterns of state action that systematically deny equality in voting, and episodic events that, despite non-discriminatory laws, may result in the

real, and, in our view, unavoidable given the inherent decentralization involved in state electoral and state recount procedures. For instance, at least 48 states employ recount procedures—many of which differ in their methods of tabulation.[11] In Florida, 65 of 67 counties use one of many different electronic voting systems certified by the Division of Elections.[12] One county uses a mechanical lever machine and another county uses manually-tabulated paper ballots. Undoubtably, the use of these disparate tabulating systems will generate tabulation differences from county to county. Unless and until each electoral county in the United States uses the exact same automatic tabulation (and even then there may be system malfunctions and the like), there will be tabulating discrepancies depending on the method of tabulation. Rather than a sign of weakness or constitutional injury, some solace can be taken in the fact that no one centralized body or person can control the tabulation of an entire statewide or national election. For the more county boards and individuals involved in the electoral regulation process, the less likely it becomes that corruption, bias, or error can influence the ultimate result of an election.

 Moreover, Plaintiffs have failed to demonstrate that manual recounts are so unreliable that their use rises to the level of a constitutional injury. The burden of proof rests squarely with Plaintiffs on this point. Manual recounts are available in numerous states, and have been used since the time of the Founding. While some level of error is inherent to manual tabulation, no method of tabulation is free from error. It has been submitted to this Court that electronic tabulation runs a five per cent error rate. In fact,

the very premise of a manual recount after an electronic tabulation, as is the case here, is to provide an additional check on the accuracy of the ballot count. While manual recounts may produce verifiable errors in certain cases, we do not find sufficient evidence to declare a law authorizing the use of a manual recount to be unconstitutional on its face. As the Supreme Court has elucidated, "[f]acial invalidation 'is, manifestly, strong medicine' that 'has been employed by the Court sparingly and only as a last resort.'" *National Endowment for the Arts v. Finley*, 524 U.S. 569, 580, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998'): see also *New York State Club Ass'n. Inc. v. City of New York*, 487 U.S. 1, 11, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988). (stating that "to prevail on a facial attack the plaintiff must demonstrate that the challenged law either 'could never be applied in a valid manner'") (citations omitted). Clearly, the manual recount process, unless rife with error (which has not been proven by Plaintiffs), has many conceivable constitutional applications that would help ensure an accurate vote tally. It is unconvincing to argue that a process structured to render a vote tally more accurate somehow structurally dilutes the voting rights of the electorate. Simply because the recount tally postdates the initial vote or, as in this case, prolongs the certification of an election result does not result in a dilution of voting rights—anymore than the tallying of lawfully-cast absentee· ballots dilutes the value of votes cast at polling precincts on election day.

 In addition, we find Plaintiffs' alleged injuries on an as-applied basis to be speculative, and far from irreparable, at this stage in the electoral recount process. The four Florida canvassing boards challenged in this case still are in the process

dilution of an individual's vote. Unlike systematically discriminatory laws, isolated events that adversely affect individuals are not presumed to be a [constitutional violation].'" *Curry,* 802 F.2d at 1314 (quoting *Gamza,* 619 F.2d at 453).

11. It has been represented to this Court by Plaintiffs that at least fifteen states employ some type of statutory manual recount scheme in presidential elections.

12. Of these, 26 use punch-card and 39 use optical-scanning systems.

of conducting a manual recount, and the record in this case is undeveloped and changing by the hour. Thus far, no manual recount results have been announced, and no evidence has been demonstrated that these recounts have generated erroneous tabulations. While some charges of subjective tabulations and potential irregularities have been leveled in vague form, the evidence on these tabulation details generally has been in the form of media broadcasts and other unsubstantiated forms. Further, each county canvassing board is at a different stage in the manual recount process, and there are different pertinent factual circumstances in each county. The inconclusive state of these recount processes coupled with their different factual postures counsels against preliminary uniform injunctive relief at this time.

 Further, there also has been no evidence presented by Plaintiffs that they lack an adequate remedy in state court to challenge either the manual recount results or the canvassing board decisions regarding the commencement and administration of recount procedures. *See Curry*, 802 F.2d at 1316–17. In fact, Florida Statutes, § 102.168 outlines an entire process by which "the certification of election or nomination of any person to office, or of the result on any question submitted by referendum, may be contested in the circuit court by any unsuccessful candidate for such office or nomination thereto or by any elector qualified to vote in the election related to such candidacy."[13] Fla. Stat. § 102.168(1). In applying this provision, the Supreme Court of Florida has held that "if a court finds substantial noncompliance with statutory election procedures and also makes a factual determination that reasonable doubt exists as to whether a certified election expressed the will of the voters, then the court in an election contest brought pursuant to section 102.168, Florida Statutes (1997), is to void the contested election even in the absence of fraud or intentional wrongdoing." *Beckstrom v. Volusia Cty. Canvassing Bd.*, 707 So.2d 720, 725 (Fla.1998). It therefore appears that if Plaintiffs could prove that the manual recounts in the four challenged counties leads to the state certification of an election result contrary to the "will of the voters," it would have a colorable claim in state court.

 In short, I simply do not find Plaintiffs' claims to have demonstrated a clear deprivation of a constitutional injury or a fundamental unfairness in Florida's manual recount provision. While this dispute has assumed clear national prominence and importance due to the close and

---

13. Specifically, Fla. Stat. § 102.168(3) allows a candidate to challenge an election on the following grounds:
 (a) Misconduct, fraud, or corruption on the part of any election official or any member of the canvassing board sufficient to change or place in doubt the result of the election.
 (b) Ineligibility of the successful candidate for the nomination or office in dispute.
 (c) Receipt of a number of illegal votes or rejection of a number of legal votes sufficient to change or place in doubt the result of the election.
 (d) Proof that any elector, election official, or canvassing board member was given or offered a bribe or reward in money, property, or any other thing of value for the purpose of procuring the successful candidate's nomination or election or determining the result on any question submitted by referendum.

 (e) Any other cause or allegation which, if sustained, would show that a person other than the successful candidate was the person duly nominated or elected to the office in question or that the outcome of the election on a question submitted by referendum was contrary to the result declared by the canvassing board or election board.
 *Id.* In addition, "[a]ny candidate, qualified elector, or taxpayer presenting such a contest to a circuit judge is entitled to an immediate hearing". Fla. Stat. § 102.168(7). "The circuit judge to whom the contest is presented may fashion such orders as he or she deems necessary to ensure that each allegation in the complaint is investigated, examined, or checked, to prevent or correct any alleged wrong, and to provide any relief appropriate under such circumstances." Fla. Stat. § 102.168(8).

undecided outcome of the presidential election, the types of specific issues raised by Plaintiffs' motion-for example, that manual ballot recounts are unreliable-are similar to the "'garden-variety' election dispute[s]" over counting ballots which have not been found to "rise to the level of a constitutional deprivation" under our case-law. *Curry*, 802 F.2d at 1315; see also *Welch v. McKenzie*, 765 F.2d 1311, 1317 (5th cir.1985). vacated on other grounds and remanded, 777 F.2d 191 (5th Cir.1985) (stating that "even though votes inadvertently counted incorrectly threw an election to the wrong candidate, this court refused to intervene" because our Constitution envisions such disputes to be regulated by state and not federal law); *Pettengill v. Putnam County R–1 Sch. Dist., Unionville, Missouri*, 472 F.2d 121 (8th Cir.1973) (refusing to intervene in election controversy where plaintiffs claimed that the right to vote had been diluted by defendant's improper counting of ballots). I agree with the *Curry* Court that "a federal court should not be 'the arbiter of disputes' which arise in elections" because it is not "the federal court's role to 'oversee the administrative details of a local election.'" *Curry*, 802 F.2d at 1315. I also stress that this not a case alleging clear and direct infringements of the right of citizens to vote through either racial intimidation or fraudulent interference with a free election such as stuffing the ballot box or deliberately undercounting votes.

 Finally, I conclude that the public interest is best served by denying preliminary injunctive relief in this instance. The mere possibility that the eventual result of the challenged manual recounts will be to envelop the president-elect in a cloud of illegitimacy does not justify enjoining the

current manual recount processes underway. Central to our democratic·process as well as our Constitution is the belief that open and transparent government, whenever possible, best serves the public interest. Nowhere can the public dissemination of truth be more vital than in the election procedures for determining the next presidency.

## V. Conclusion

While I share a desire for finality, I do not believe it can be accomplished through this request for an injunction. One of the strengths of our Constitution's method for selection of the President is its decentralization. Florida, one of the 50 states, has 67 counties, each with a supervisor of election, a canvassing board, and different voting and tabulation equipment. In a close statewide election, it is difficult to come to a final determination.[14]

A federal court has a very limited role and should not interfere except where there is an immediate need to correct a constitutional violation. At this stage, there is no likelihood that such a showing can be made. The request for preliminary injunction is DENIED.

DONE AND ORDERED in Chambers, at Miami, Florida, this 13th day of November 2000.

---

14. I have sympathy with the election officials throughout the state who are struggling to come to a conclusion. In his dissent in *Williams v. Rhodes*, 393 U.S. 23, 64, 89 S.Ct. 5, 27, 21 L.Ed.2d 24, 60 (1968). Chief Justice Warren pointed out that the Supreme Court had but seven days to consider the important constitutional questions presented in that case and had been compelled to decide the case"without the unhurried deliberation which is essential to the formulation of sound constitutional principles." I have tried to be mindful of the pressures on the parties in this case, allowing at least a day for the Defendants to respond, and I am attempting to rule promptly so that an appellate court will have an opportunity for meaningful review.